THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeMARCUS HILLSMAN, Defendant-Appellant.

Fourth District    No. 4—04—0022

Argued September 22, 2005.—Opinion filed December 7, 2005.

Charles M. Schiedel and Allen H. Andrews (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Frank Young, State's Attorney, of Danville (Norbert J. Goetten, Robert J.

Biderman, and Linda Susan McClain (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In March 2000, the State charged defendant, DeMarcus Hillsman, with four counts of first degree murder of Manley Fuller (720 ILCS 5/9—1 (West 2000)). In February 2001, defendant filed a motion to suppress certain evidence (articles of defendant's clothing and any evidence derived therefrom) that the police seized from him while he was being treated in the emergency room on the night of the incident. Following a May 2001 hearing, the trial court denied defendant's motion.

In October 2001, defendant filed a motion to exclude evidence of his flight, which the trial court denied. That same month, a jury convicted defendant of first degree murder (720 ILCS 5/9—1 (West 2000)), and the court later sentenced him to 35 years in prison. Defendant appealed, and in August 2003, this court remanded to the trial court to allow defendant to file a motion to reconsider his sentence. *People v. Hillsman*, No. 4—01—1104 (August 20, 2003) (unpublished order under Supreme Court Rule 23). In November 2003, the court reduced defendant's sentence to 32 years in prison.

Defendant appeals, arguing that (1) the trial court erred by denying (a) his motion to suppress and (b) his motion to exclude evidence of his flight; (2) the State failed to prove him guilty beyond a reasonable doubt; and (3) the prosecutor made improper comments during closing and rebuttal arguments. We disagree and affirm.

## I. BACKGROUND

### A. Defendant's Motion To Suppress Evidence Seized While Defendant Was an Emergency-Room Patient

At the May 2001 hearing on defendant's motion to suppress evidence seized while he was an emergency-room patient, defendant testified that during the early morning hours of January 30, 2000, he was an emergency-room patient at Carle Hospital in Urbana. While he was being treated for a shoulder wound, police officers arrived and spoke with him. The officers did not show him a search warrant or ask for his consent to take any of his personal belongings.

Defendant acknowledged that the police officers came to the emergency room after he informed hospital staff that he had been shot. He also acknowledged that (1) he told the officers what items of clothing he was wearing when he was shot, (2) one of the officers retrieved those items (which were located in the room where defendant was being treated), and (3) the officers left the hospital with those

clothing items. Defendant did not object when the officers took his clothing.

Danville police officer Keith Garrett testified that around 4:30 a.m. on January 30, 2000, he and police detective Gene Woodard arrived at the Carle Hospital emergency room in response to a report that defendant had been shot. Garrett and Woodard spoke with defendant, who told them that he had been shot earlier that evening in Danville. He also told the officers that during the shooting, he had been wearing the jeans and shoes that were located in a basket under defendant's hospital gurney. Garrett noticed that defendant's shoes had what appeared to be blood on them. Because it was standard procedure to retrieve clothing that a shooting victim had been wearing at the time of the shooting, the officers seized defendant's jeans and shoes.

Garrett acknowledged that when he and Woodard spoke with defendant, he was aware of the investigation into Fuller's death (which had occurred in Danville several hours earlier). He also acknowledged that he was aware that the seizure of defendant's shoes could possibly assist in the murder investigation.

After considering the evidence and counsel's arguments, the trial court denied defendant's motion to suppress. In particular, the court determined that (1) an individual has no reasonable expectation of privacy in a hospital emergency room, and (2) defendant's jeans and shoes were in the police officers' plain view.

### B. Defendant's Jury Trial

At the start of defendant's October 2001 jury trial, defendant filed a motion seeking to prohibit the State from introducing evidence of defendant's flight from police. Defendant argued that such evidence was irrelevant and "highly prejudicial." Following a nonevidentiary hearing on that motion, the trial court denied it.

At defendant's jury trial, the evidence showed the following. Shortly after midnight on January 30, 2000, a Danville police officer responded to a dispatch and found Fuller's body lying in the snow on the south side of an apartment building at 604 North Walnut Street in Danville. The officer found no weapons nearby. (An autopsy later showed that Fuller, who was 6 feet 4 inches tall and weighed 176 pounds, had been shot in the left side of his neck above his collarbone. The .45-caliber bullet traveled from Fuller's neck in a steep downward angle through his aorta, right lung, diaphragm, and kidney.)

Daniel Millis testified that just before the shooting, his truck stalled while he was plowing a church parking lot that was diagonal to 604 North Walnut Street. As he sat in the cab waiting for the engine

to cool down, he saw two black men leave a nearby house and walk along the sidewalk. One of the men was wearing blue jeans and a white T-shirt and the other was wearing dark clothing. The man wearing dark clothing was a little bit heavier and taller than the other individual. The men walked between the two houses at 602 and 604 North Walnut and stood behind a tree. Millis then heard a loud bang and glimpsed a flash from behind the tree. He then saw the smaller man wearing jeans and a white T-shirt run between the houses.

Steve Young, who lived in an apartment at 602 North Walnut Street, testified that Fuller lived with Demetrius Moore in the other first-floor apartment at 602 North Walnut. During the evening of January 29, 2000, Young saw both defendant and Fuller in Moore's apartment at separate times. Young did not think that anyone else was in Moore's apartment that evening. Young left his apartment around 11:30 p.m., and when he returned a short time later, he saw Fuller lying in the snow.

A Carle Hospital emergency room nurse testified that in the early morning hours of January 30, 2000, two individuals brought defendant to the emergency room. Defendant told the nurse that he had been shot at a Champaign "house party." The nurse then telephoned 9-1-1 because medical personnel are required to notify police when assault victims seek treatment. After Champaign police arrived at the emergency room, the nurse answered a telephone call for defendant and spoke to his uncle. Following that conversation, the nurse told the officer that defendant had been shot on North Walnut Street in Danville, not in Champaign.

A Carle Hospital emergency room physician testified that defendant reported that he had been walking down a street in Champaign "when somebody going by in a car shot him in the left shoulder."

A Champaign police officer testified that after he arrived at the Carle Hospital emergency room around 1:30 a.m. on January 30, 2000, and spoke with a nurse, he spoke with defendant's brother, Benjamin Hillsman. Benjamin told him that defendant had been shot in Danville. The officer then telephoned the Danville police and informed them that the shooting had occurred in Danville. The officer also spoke with defendant, who informed the officer that he had been shot by an unidentified black male on Walnut Street in Danville.

Woodard testified that around 4:30 a.m. on January 30, 2000, he and Garrett arrived at the Carle Hospital emergency room to speak with defendant. Woodard and Garrett informed defendant that (1) there was another shooting victim in Danville and (2) the officers wanted to talk with defendant about the circumstances surrounding his gunshot wound. Defendant told the officers that he was walking

from his parents' Danville residence at 608 East Seminary Street to 1018 North Franklin Street. As he was walking on Walnut Street, he saw a parked car with its engine running and a black male standing on a porch at the house on the corner of Walnut and Davis Streets. The man stepped off the porch, walked toward defendant, and said something. When the man was about 10 or 15 feet away, defendant heard two or three gunshots and began running north toward the 1018 North Franklin residence. He then realized that he had been shot and continued to 1018 North Franklin.

Defendant also told the officers that at the time of the shooting, he was wearing blue jeans, a T-shirt, a shirt, a white down jacket, and shoes. He informed officers that the jeans and shoes were in a basket under the gurney he was lying on, but he had left the other clothing items at 1018 North Franklin. Woodard noticed that defendant's jeans and shoes appeared to have blood on them. Garrett took defendant's jeans and shoes as evidence.

During the interview, Woodard twice asked defendant if he had a gun during the incident and had perhaps used it in self-defense. Defendant denied having a gun or seeing anyone with a gun. He also denied ever having been in Moore's apartment. (An Illinois State Police forensic scientist later determined that fingerprints found on beer bottles retrieved from Moore's apartment matched defendant's fingerprints.)

Aaron Small, an Illinois State Police forensic scientist, testified that he conducted deoxyribonucleic acid (DNA) analysis of blood samples from defendant and Fuller and the bloodstains found on defendant's jeans. Small opined that the DNA test results indicated that the blood on the back leg of defendant's jeans matched Fuller's DNA profile. Small explained that a "match" meant that the individual cannot be excluded as a possible contributor to the bloodstain. The likelihood that another individual unrelated to Fuller could have been the source of the bloodstain is 1 out of 14 quadrillion in the black population and 1 out of 22 quadrillion in the Hispanic population. (Fuller was black.) Small also testified that another bloodstain on defendant's jeans was a mixture of DNA profiles and neither defendant nor Fuller could be excluded as the source.

Kylie McNew testified that sometime after midnight on January 30, 2000, she received a telephone call from Mary Renee White (defendant's cousin) and Katia (Mary Renee's daughter). She also heard a man's voice in the background, but she could not remember what he said. After the phone call, her boyfriend arrived and she told him that there was a gun outside her house in the snow. Her boyfriend retrieved the gun and brought it inside. In the middle of the night, a

man (whom McNew later identified in a photographic lineup as defendant's brother, Lamar Hillsman) knocked on McNew's back door and said he was there for the gun. McNew gave him the gun. The trial court admitted McNew's grand-jury testimony, in which she testified that Lamar picked up the gun from her residence the day after the shooting.

Mary Renee testified that during the early morning hours of January 30, 2000, defendant knocked on the door at her 1018 North Franklin Street residence. He was wearing pants and a T-shirt, but he did not have a coat. He was wet and covered with blood. Defendant told Mary Renee and Katia that he had been shot and asked them to call Benjamin. Mary Renee and Katia took defendant's T-shirt and tried to clean him with a towel. About 20 minutes later, Benjamin arrived and took defendant to the hospital. Mary Renee later gave police defendant's clothing and the towel.

Katia testified that she remembered little of what happened after defendant arrived at Mary Renee's residence on the night of the shooting. The trial court then admitted Katia's grand-jury testimony, in which she testified that after defendant arrived, he asked her to telephone McNew. Katia listened as defendant told McNew he had hidden a gun outside her house by a water meter and asked her to get it. Katia also testified that defendant told Benjamin and her that he shot himself while arguing with "some dude."

Danville police officer James Smutz testified that on January 30, 2000, he went to 608 East Seminary Street and spoke with defendant's parents. He told them that he was looking for defendant, but they said that defendant was not there. Smutz stopped by their residence at least one other time and again told them that he was looking for defendant.

Garrett testified that on February 2 or 3, 2000, he went to defendant's parents' residence and told them that he was looking for defendant to conduct a follow-up interview. Defendant's parents told Garrett that defendant was staying somewhere else in Danville. On February 12, 2000, Garrett pulled over a car that was being driven by Benjamin. Garrett told Benjamin that the police were looking for defendant and needed to talk to him. Benjamin denied knowing defendant's whereabouts.

Deputy United States Marshall Ken Robinson testified that in April 2000, he began working on defendant's apprehension on a "collateral basis." He was officially assigned to the case in June 2000. In an attempt to locate defendant, Robinson first interviewed defendant's close family members as to their knowledge of his whereabouts. This took place over the course of about five months. In November 2000,

Robinson received information that defendant might be staying with someone in Peoria. In mid-November 2000, Robinson apprehended defendant at that Peoria residence.

Moore testified that on January 29, 2000, Fuller was living alone in Moore's apartment. Moore stated that defendant and Fuller knew each other and "[t]reat[ed] each other like brothers."

Defendant testified on his own behalf that around 11 p.m. on January 29, 2000, he left his parents' residence and began walking toward Mary Renee's residence at 1018 North Franklin Street. As he walked along North Walnut Street, he saw an individual walking off a porch at 602 North Walnut Street. The individual walked toward defendant and said something that defendant could not understand. As he came within an arm's length of defendant, defendant heard gunshots. Defendant then ran away and eventually realized he had been shot. He then continued on to Mary Renee's residence and knocked on her door. While he waited for her to open the door, he took off his jacket to look at his gunshot wound. Defendant did not know what happened to his jacket (which was never found). He denied having a gun or talking with McNew by telephone that night. He also denied telling (1) anyone at Carle Hospital that he had been shot in Champaign or (2) the police that he had never been in Moore's apartment. Defendant acknowledged that he (1) knew Fuller from playing basketball and video games at Moore's apartment and (2) had played video games at Moore's apartment on January 29, 2000. Defendant left Moore's apartment between 5 and 6 p.m. that day.

Defendant also testified that between January 30, 2000, and his November 2000 arrest, he lived with Benjamin in Danville. He acknowledged that during that time, Benjamin told him that the police were looking for him, but he did not go talk to them.

Lamar testified and denied having picked up a gun from McNew's residence. Benjamin testified that he took defendant to Carle Hospital because that trauma center was better than the Danville trauma center. Benjamin acknowledged that he told Carle medical personnel that defendant had been shot in Champaign.

Based on the evidence presented, the jury convicted defendant of first degree murder. In December 2001, the trial court sentenced him to 35 years in prison. However, as previously stated, in November 2003, the trial court reduced defendant's sentence to 32 years in prison following this court's remand.

This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Denial of Defendant's Motion To Suppress Evidence Seized While Defendant Was an Emergency-Room Patient

Defendant first argues that the trial court erred by denying his motion to suppress evidence seized while he was an emergency-room patient. The State responds, in part, that the seizure was justified under the plain-view doctrine. We agree with the State.

The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. In *People v. Jones*, 215 Ill. 2d 261, 268-69, 830 N.E.2d 541, 548 (2005), our supreme court discussed the fourth amendment, in pertinent part, as follows:

> "The central requirement of the fourth amendment is reasonableness. *Illinois v. McArthur*, 531 U.S. 326, 330, 148 L. Ed. 2d 838, 847, 121 S. Ct. 946, 949 (2001). The touchstone of a fourth amendment analysis 'is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." ' *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 54 L. Ed. 2d 331, 335, 98 S. Ct. 330, 332 (1977), quoting *Terry v. Ohio*, 392 U.S. 1, 19, 20 L. Ed. 2d 889, 904, 88 S. Ct. 1868, 1878-79 (1968)."

Generally, reasonableness requires police officers to have a warrant supported by probable cause. *Jones*, 215 Ill. 2d at 269, 830 N.E.2d at 548.

However, the United States Supreme Court has made clear that exceptions to the warrant requirement exist. "When faced with special law[-]enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *McArthur*, 531 U.S. at 330, 148 L. Ed. 2d at 847, 121 S. Ct. at 949. "Thus, the reasonableness of a particular law[-]enforcement practice is judged by balancing its promotion of legitimate governmental interests against its intrusion on fourth[-]amendment interests, *i.e.*, the individual's right to personal security free from arbitrary interference by law[-]enforcement officers." *Jones*, 215 Ill. 2d at 269, 830 N.E.2d at 549.

Balancing the aforementioned interests, the United States Supreme Court in *Horton v. California*, 496 U.S. 128, 137, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301, 2308 (1990), held that the fourth amendment permitted the warrantless seizure of evidence in plain view even though the officer's discovery was not inadvertent. For warrantless

seizures to be valid under the plain-view doctrine, the Court ruled that two conditions must be met, in addition to the essential predicate that "the officer did not violate the [f]ourth [a]mendment in arriving at the place from which the evidence could be plainly viewed." *Horton,* 496 U.S. at 136, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308. Those two conditions are (1) the object's incriminating character must be " 'immediately apparent' " (*Horton,* 496 U.S. at 136, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308, quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038 (1971)); and (2) the officer must have a "lawful right of access to the object itself" (*Horton,* 496 U.S. at 137, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308).

The plain-view doctrine requires an officer to have probable cause to associate the evidence with criminal activity before he may invoke the doctrine to seize the evidence. *Jones,* 215 Ill. 2d at 272, 830 N.E.2d at 550; see also *Texas v. Brown,* 460 U.S. 730, 741-42, 75 L. Ed. 2d 502, 513, 103 S. Ct. 1535, 1543 (1983), quoting *Payton v. New York,* 445 U.S. 573, 587, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380 (1980) (the " 'seizure of property in plain view involves no invasion of privacy *and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity"* (emphasis in original)). Although probable cause does not require evidence sufficient to convict, it requires more than a "mere suspicion." *People v. DeLuna,* 334 Ill. App. 3d 1, 13, 777 N.E.2d 581, 593 (2002). " 'In dealing with probable cause, \*\*\* we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.' " *People v. Love,* 199 Ill. 2d 269, 279, 769 N.E.2d 10, 17 (2002), quoting *Brinegar v. United States,* 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310 (1949).

In reviewing a trial court's ruling on a motion to suppress, a reviewing court is presented with both questions of fact and law. We will uphold the trial court's factual findings unless they are against the manifest weight of the evidence. *People v. Smith,* 214 Ill. 2d 338, 347, 827 N.E.2d 444, 450 (2005). "This deferential standard of review is grounded in the reality that the [trial] court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Pitman,* 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100-01 (2004). However, we review *de novo* the ultimate question of whether the evidence should have been suppressed. *Smith,* 214 Ill. 2d at 347, 827 N.E.2d at 450.

█ In this case, the "essential predicate" set forth in *Horton* was satisfied because Garrett and Woodard had a lawful right to be in the

emergency room where defendant was being treated. In *People v. Torres*, 144 Ill. App. 3d 187, 190-91, 494 N.E.2d 752, 755 (1986), this court held that a defendant has no objectively reasonable expectation of privacy in an emergency room. In so holding, we reasoned, in part, that the presence of police officers in emergency rooms was an "obvious consequence" of the Illinois law requiring medical personnel to inform authorities of any person seeking treatment whose injuries may have been caused by criminal conduct (see 20 ILCS 2630/3.2 (West 2000)). *Torres*, 144 Ill. App. 3d at 191, 494 N.E.2d at 755. We adhere to *Torres* and thus conclude that Garrett and Woodard did not violate the fourth amendment by being present in the emergency room while defendant was being treated for a gunshot wound.

In addition, the evidence at both the suppression hearing and defendant's trial showed that (1) defendant's jeans and shoes were in the officers' plain view in the basket under defendant's hospital gurney and (2) Garrett and Woodard had probable cause to associate those items with criminal activity. We note that (1) defendant told the officers that the jeans and shoes he was wearing when he was shot were in the basket and (2) the officers noticed that defendant's jeans and shoes appeared to have blood on them. The officers thus had probable cause to believe that defendant's clothing was evidence concerning the incident that left defendant with a gunshot wound to his shoulder. In other words, the link between the incident in which defendant was shot and his jeans and shoes was immediately apparent.

We thus conclude that the officers' seizure of defendant's jeans and shoes was permissible under the plain-view doctrine. Accordingly, we further conclude that the trial court did not err by denying defendant's motion to suppress.

In so concluding, we reject defendant's contention that in order for the officers to have lawfully seized his clothing, they needed probable cause to believe that those items incriminated *him*. The only requirement is that the seized items possess an immediately apparent incriminating character as to *some crime committed by someone*. It is not necessary that the police have probable cause to believe that the items they intend to seize incriminate their owner or any specific individual. In this regard, we agree with the trial court, which stated as follows:

> "It would almost seem contrary to reason to think that bloody clothing, after [a] report of a gunshot wound, would not be taken by law[-]enforcement officers in *** trying to find blood *** that might match or *** do something in furtherance of the defendant's complaint, which was that he was the victim in this case."

### B. The Trial Court's Denial of Defendant's Motion
### To Suppress Evidence of Defendant's Flight

Defendant next argues that the trial court erred by denying his motion to exclude evidence of his flight. Specifically, he contends that no inference of guilt could be drawn because no evidence showed that he knew he was a suspect in Fuller's death. We disagree.

A jury may consider evidence of a defendant's flight as tending to prove guilt. *People v. Lewis*, 165 Ill. 2d 305, 349, 651 N.E.2d 72, 93 (1995). "The inference of guilt that may be drawn from flight depends upon the suspect's knowledge that (1) the offense had been committed, and (2) he is or may be suspected." *People v. Ransom*, 319 Ill. App. 3d 915, 920, 746 N.E.2d 1262, 1267 (2001). "While evidence that a defendant was aware that he was a suspect is essential to prove flight, actual knowledge of his possible arrest is not necessary to render such evidence admissible where there is evidence from which such fact may be inferred." *Lewis*, 165 Ill. 2d at 350, 651 N.E.2d at 93. The trial court's ruling on whether to allow evidence of a defendant's flight lies within that court's sound discretion. Thus, we will not reverse the trial court's decision absent an abuse of that discretion. *Ransom*, 319 Ill. App. 3d at 920, 746 N.E.2d at 1267.

■ In this case, the State's theory of defendant's flight was based on the following evidence: (1) defendant initially lied to authorities about the city in which he was shot; (2) defendant hid his gun in Danville and then sought medical treatment in Champaign; (3) within hours of Fuller's murder, police officers (a) twice asked defendant whether he was involved in the shooting and whether he acted in self-defense and (b) took some of defendant's clothing; (4) Smutz went to defendant's parents' residence on at least two occasions and told them that the police were looking for defendant; (5) in early February 2000, Garrett went to defendant's parents' residence and told them that police were looking for defendant; (6) in mid-February 2000, Garrett told Benjamin that the police needed to talk with defendant; (7) from June 2000 through November 2000, Robinson searched for defendant and interviewed his close relatives as to their knowledge of his whereabouts; and (8) defendant, who claimed that he lived in Danville with Benjamin from the time of the shooting until his November 2000 arrest, admitted that he knew that the police were "looking for him" and "wanted to talk to [him]."

Based on that evidence, the jury reasonably could have inferred that defendant (1) knew that he was a suspect in Fuller's murder and (2) consciously avoided police. We thus conclude that the trial court did not abuse its discretion by denying defendant's motion to suppress evidence of his flight.

## C. Sufficiency of the Evidence

■ Defendant next argues that the State failed to prove beyond a reasonable doubt that he committed the offense of first degree murder. Specifically, he contends that the State's case was based "entirely upon circumstantial evidence and speculation." In particular, defendant cites the following: (1) defendant and Fuller got along well; (2) the State established no motive for the shooting; (3) the State presented "no evidence to show that the shooting was not an accident"; (4) defendant did not confess to murdering Fuller; (5) no evidence showed how defendant (who, at 5 feet 6 inches tall, was several inches shorter than Fuller) shot Fuller in the neck with a bullet that traveled in a downward path; (6) defendant's mere presence in Moore's apartment with Fuller was not enough to sustain his conviction; and (7) defendant's gunshot wound did not link him to the shooting of Fuller.

In response, the State argues that the evidence was sufficient to support the jury's finding that defendant committed the offense of first degree murder. In particular, the State points out that "[v]iewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant committed the crime and committed it with, at a minimum, knowledge that his acts created a strong probability of death or great bodily harm." In support of its argument, the State cites the following: (1) DNA test results indicated that the blood on the back leg of defendant's jeans matched Fuller's DNA profile; (2) the likelihood that another individual unrelated to Fuller could have been the source of that bloodstain is 1 out of 14 quadrillion in the black population; (3) Millis (a) saw two individuals matching the description of Fuller and defendant stand close enough to each other so that a tree obscured his view of them, (b) heard a single gunshot, and (c) saw the individual matching defendant's description run from the scene; (4) Fuller was shot in the neck; and (5) defendant fled from the scene, concealed the weapon under a water meter at McNew's residence, sought treatment in another city, and eluded arrest for several months, all of which indicated his consciousness of guilt.

The State also asserts that defendant's credibility was impaired by his contradictory versions of the incident in which he was shot. In particular, the State points to the following: (1) defendant told Katia and Benjamin that he shot himself while arguing with another individual; (2) defendant told the emergency-room nurse that he had been shot at a house party in Champaign; (3) he told the emergency-room physician that he had been shot in a drive-by shooting in Champaign; (4) he told police that (a) he had been shot by someone in Danville, (b) the individual who stepped off the porch was never closer

than 10 feet to him, and (c) he had never been in Moore's apartment; and (5) defendant testified at trial that (a) he had been shot, (b) he did not know what happened, (c) the individual who stepped off the porch came within an arm's length of him, and (d) he had been in Moore's apartment on January 29, 2000. We agree with the State.

To achieve a successful prosecution for first degree murder, the State, *inter alia*, must prove beyond a reasonable doubt at least one of the following: the defendant (1) intended to kill or do great bodily harm to the victim, (2) knew his acts would cause death or great bodily harm to the victim, or (3) knew his acts created a strong probability of death or great bodily harm to the victim. *People v. Raines*, 354 Ill. App. 3d 209, 219-20, 820 N.E.2d 592, 601 (2004); 720 ILCS 5/9—1(a)(1), (a)(2) (West 2000). Thus, the State may achieve a successful prosecution for first degree murder by proving that the defendant "willfully and voluntarily committed the act, the natural tendency of which was to destroy another's life." *People v. Givens*, 364 Ill. App. 3d 37, 44 (2005).

In *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 558-59 (2005), the Supreme Court of Illinois addressed a defendant's argument that the State's evidence was not sufficient to sustain his conviction and wrote the following:

"When reviewing the sufficiency of the evidence of a criminal conviction, it is not the function of [a reviewing] court to retry the defendant. [Citation.] The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

The supreme court has also stated that "[u]nder this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Bush*, 214 Ill. 2d 318, 326, 827 N.E.2d 455, 460 (2005).

Having carefully reviewed the evidence in the light most favorable to the State, we conclude that the evidence supports the guilty verdict. The trier of fact has the responsibility to determine the witnesses' credibility, weigh the evidence and draw reasonable inferences therefrom, and resolve any conflicts in the evidence. *People v. Hensley*, 354 Ill. App. 3d 224, 228, 819 N.E.2d 1274, 1279 (2004). Based on the sum of the State's evidence, the jury reasonably could have found that defendant committed the offense of first degree murder. In particular, given the evidence that (1) the blood found on defendant's jeans matched Fuller's DNA profile, (2) defendant and Fuller were standing in close proximity at the time of the shooting, and (3) Fuller was shot in the neck, the jury reasonably could have found that defendant shot

Fuller with the knowledge that his acts created a strong probability of death or great bodily harm.

In so concluding, we reject defendant's suggestion that the State failed to prove him guilty beyond a reasonable doubt because it did not show a motive for the shooting. It is well established that the State is not obligated to prove motive to sustain a conviction for first degree murder. *People v. James*, 348 Ill. App. 3d 498, 509, 810 N.E.2d 96, 106 (2004); *People v. Jackson*, 243 Ill. App. 3d 1026, 1031, 614 N.E.2d 94, 98 (1993).

### D. The Prosecutor's Closing and Rebuttal Arguments

■ Last, defendant argues that the prosecutor made improper comments during closing and rebuttal arguments. Specifically, he complains that the prosecutor (1) misrepresented the DNA evidence by stating that the 1-in-14-quadrillion likelihood of a DNA match meant that the world would have to have a population of over two million times its current population to find the other person who would have contributed the DNA found on defendant's jeans and (2) misstated the law as to the required mental state for first degree murder when he stated that the mere fact that Fuller had been fatally shot established the necessary mental state. Defendant concedes that by failing to raise a timely objection at trial or include these issues in his posttrial motion, he has forfeited these issues on appeal. Nonetheless, he urges us to review them under the plain-error doctrine.

Recently, in *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005), our supreme court discussed the plain-error doctrine, as follows:

> "The plain-error doctrine, as it has developed in Illinois, allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances. First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.] Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing—namely, a fair trial."

The *Herron* court also stated as follows:

> "We reiterate: the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the serious-

ness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 186-87, 830 N.E.2d at 479-80.

This court will take our supreme court at its word and find plain error only in exceptional cases in which either (1) the evidence was so closely balanced that the plain error alone severely threatened to tip the scales of justice against the defendant or (2) the plain error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. This case does not meet either of those standards.

Even accepting defendant's contention that the complained-of remarks were improper, we conclude that the evidence was not so closely balanced that the alleged error alone severely threatened to tip the scales of justice against defendant. Instead, the State presented a strong circumstantial case against defendant. In particular, as earlier stated, the evidence showed that (1) DNA test results indicated that blood found on defendant's jeans matched Fuller's DNA profile; (2) the likelihood that another individual unrelated to Fuller could have been the source of that bloodstain is 1 out of 14 quadrillion in the black population; (3) Millis (a) saw two individuals matching the description of Fuller and defendant stand so close to each other that a tree obscured his view of them, (b) heard a single gunshot, and (c) saw the individual matching defendant's description run from the scene; (4) Fuller was shot in the neck; (5) defendant fled from the scene and concealed the weapon under a water meter at McNew's residence; and (6) defendant gave several contradictory versions of the incident in which he was shot.

In addition, when viewed in the context of the parties' closing arguments as a whole, the prosecutor's comments did not affect the fairness of defendant's trial or challenge the integrity of the judicial process. In that regard, we note that (1) the trial court instructed the jury (a) that closing arguments are not evidence and arguments not based on the evidence are to be disregarded and (b) as to the necessary mental states for a conviction of first degree murder; and (2) the prosecutor's allegedly improper comments were not overly extensive.

Accordingly, we will not address defendant's arguments under the plain-error doctrine. See *People v. Ceja*, 204 Ill. 2d 332, 356-58, 789 N.E.2d 1228, 1244-45 (2003) (in which the supreme court declined to address on the merits the defendant's claim that the prosecutor overstated evidence during closing argument, upon concluding that (1) the evidence was not closely balanced and (2) when viewed in the context of the entire closing argument, the complained-of comments "did not prejudice [the] defendant such as to deny [the] defendant a fair trial or threaten deterioration of the judicial process"); *People v. Brooks*, 345 Ill. App. 3d 945, 953, 803 N.E.2d 626, 632 (2004) (in which the appellate court declined to address on the merits the defendant's claim that the prosecutor's closing argument denied him a fair trial, upon concluding that no reason existed to excuse the defendant's procedural default because the complained-of remarks did not prejudice the defendant or compromise the integrity or fairness of the trial).

In so concluding, we note that this case demonstrates the importance of timely objecting to an alleged error. Defendant's failure to object deprived the trial court of the opportunity to clarify the law and to remind the jury that closing arguments are not evidence. It also deprives this court of the trial court's assessment of the alleged error.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON and McCULLOUGH, JJ., concur.