NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180729-U

NO. 4-18-0729

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 21, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| DEMARCUS HILLSMAN, | ) | No. 00CF141 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Mark S. Goodwin, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's denial of defendant's successive postconviction petition after a third-stage evidentiary hearing.

¶ 2         In October 2001, a jury convicted defendant, DeMarcus Hillsman, of first degree murder (720 ILCS 5/9-1 (West 2000)), and the trial court later sentenced him to 35 years in prison. In 2005, this court affirmed defendant's conviction and sentence on direct appeal. *People v. Hillsman*, 362 Ill. App. 3d 623, 639, 839 N.E.2d 1116, 1130 (2005).

¶ 3         In November 2004, defendant filed a postconviction petition. The trial court summarily dismissed the petition, and on appeal, this court granted the Office of the State Appellate Defender's motion to withdraw, concluding that no meritorious issues could be raised. *People v. Hillsman*, No. 4-04-1059 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 4        In March 2008, defendant *pro se* filed a successive postconviction petition. In

February 2009, the trial court appointed counsel to represent defendant. After years of delay and

multiple changes in postconviction counsel, the court permitted defendant to file a successive

postconviction petition and conducted a third-stage evidentiary hearing. In August 2015, the

court entered a written order denying defendant's claim for postconviction relief. Defendant

appealed, but this court remanded the case so postconviction counsel could comply with Illinois

Supreme Court Rule 651(c) (eff. July 1, 2017). *People v. Hillsman*, No. 4-15-0804 (2017)

(unpublished summary order under Illinois Supreme Court Rule 23(c)). In September 2018,

postconviction counsel filed a Rule 651(c) certificate.

¶ 5        Defendant appeals, arguing postconviction counsel provided unreasonable

assistance by failing to (1) amend the successive petition to include allegations to overcome

claims of forfeiture and (2) bring to the trial court's attention key facts contained in the affidavit

of an eyewitness, entered into evidence at the evidentiary hearing. We disagree and affirm.

¶ 6                                I. BACKGROUND

¶ 7        A more detailed description of the procedural history of the case and testimony at

trial can be found in *Hillsman*, 362 Ill. App. 3d at 625-30. Here, we set forth only the

information necessary to the resolution of this appeal.

¶ 8                           A. The Trial and Direct Appeal

¶ 9        In March 2000, the State charged defendant with four counts of first degree

murder of Manley Fuller. 720 ILCS 5/9-1 (West 2000). In October 2001, the trial court

conducted defendant's jury trial. The State presented evidence that police found Fuller's body

near an apartment building on North Walnut Street in Danville just after midnight on January 30,

2000. An autopsy showed that Fuller had been shot in the left side of his neck at a steep

downward angle such that the bullet went through his heart, lung, and kidney.

¶ 10    Daniel Millis testified that he was plowing a church parking lot across the street on the night of the murder. Millis's truck stalled, and while he waited for it to cool down, he saw two black men leave a house. One man was tall and wearing dark clothing, the other was short and wore blue jeans and a white t-shirt. Millis stated the two men walked down the sidewalk, went between two houses, and then stood behind a tree. Millis heard a loud bang and saw a flash of light from behind the tree, followed by the shorter man in the white t-shirt running away.

¶ 11    Steve Young testified that he lived in the same apartment complex on Walnut Street as Fuller. Young stated that defendant was at Fuller's place on January 29 because he came to Young's apartment to use the phone. Young left the apartment around 11:30 p.m., and when he came back between 20 and 30 minutes later, he saw Fuller in the snow and called the police.

¶ 12    Mary Renee White testified that defendant knocked on her door in the early morning hours of January 30. Mary Renee was a relative of defendant and lived several blocks north of Fuller at 1018 Franklin Street. Defendant was wet, covered in blood, and wearing jeans and a t-shirt but no coat. Defendant told Mary Renee and her daughter, Katia, that he had been shot and asked to call his brother Benjamin. Mary Renee and Katia tried to help clean up the blood until Benjamin arrived about 20 minutes later and took defendant to the hospital.

¶ 13    Katia testified she remembered little of what happened that night. The trial court admitted her prior grand jury testimony, in which Katia stated that defendant called Kylie McNew and told McNew he had hidden a gun outside her house near a water meter and asked her to get it. Katia also stated that defendant told her and Benjamin that he shot himself while arguing with "some dude."

¶ 14 McNew testified that she received a phone call from Katia sometime after midnight on January 30. After the call, her boyfriend came home, and she told him there was a gun outside of her house. Her boyfriend went and got the gun. Later that night, a man came and picked up the gun. The trial court admitted McNew's grand jury testimony, in which she testified Lamar Hillsman, defendant's brother, picked it up.

¶ 15 Health care workers from Carle Hospital in Champaign testified that defendant came to the emergency room with a gunshot wound in the early morning of January 30. According to a nurse, defendant told her he got shot at a house party in Champaign. According to a treating physician, defendant told him he was shot from a car as he was walking down a Champaign street. The nurse also answered a phone call for defendant from his uncle. After the call, she told Champaign police defendant had been shot on North Walnut Street in Danville.

¶ 16 Two Danville police officers testified that they arrived at Carle Hospital at 4:30 a.m. on January 30. They told defendant there had been another shooting victim in Danville and they wanted to talk with defendant about his gunshot wound. Defendant told them he had been walking from his parents' house to Mary Renee's house. When he got to Walnut Street, he saw a black male step off of a porch, walk towards him, and say something. When the man was between 10 and 15 feet away, defendant heard two or three gunshots. Defendant ran to Mary Renee's house, and along the way, he realized he had been shot.

¶ 17 Defendant told the police he was wearing jeans, a t-shirt, a white First Down jacket, and shoes. Defendant said the jeans and shoes in the basket underneath his hospital bed were the ones he was wearing at the time. The officers noticed blood on the clothing and took them as evidence. The officers asked defendant if he had a gun during the incident, and defendant denied ever having or seeing a gun. Defendant also denied ever having been in

- 4 -

Fuller's apartment.

¶ 18    A forensic scientist with the Illinois State Police testified that he conducted DNA testing of blood found on defendant's jeans. The scientist stated that blood found on the back leg of the jeans matched Fuller's DNA profile.

¶ 19    Police officers testified that in February 2000, they told defendant's parents and Benjamin that they were looking for defendant and wanted to speak with him. A Deputy United States Marshal testified that he was assigned to look for defendant in June 2000. In November 2000, the marshal arrested defendant at a Peoria residence.

¶ 20    Defendant testified similarly to what he had told the police in the hospital. He left his parents' house around 11 p.m. and walked to Mary Renee's house. On North Walnut Street, he saw a man step off a porch at 602 North Walnut Street and walk towards him. The man said something defendant could not understand and, when the man got within an arm's length of defendant, defendant heard gunshots. Defendant ran away, realized he had been shot, and continued to Mary Renee's. When he arrived, he took off his white jacket to look at the wound and did not know what happened to it.

¶ 21    Defendant denied having a gun or speaking to McNew that night. Defendant further denied telling hospital staff he had been shot in Champaign or telling police he had never been to Fuller's apartment. Defendant testified that he played basketball with Fuller and had played video games at his apartment on January 29, but he left between 5 and 6 p.m. Defendant stated he lived with Benjamin in Danville between January and November 2000. He was aware the police were looking for him, but he did not go talk to them.

¶ 22    Lamar testified and denied picking up a gun from McNew's house. Benjamin testified that he took defendant to Carle Hospital because the trauma center was better than the

one in Danville. Benjamin admitted he told medical personnel that defendant had been shot in Champaign.

¶ 23    The jury convicted defendant of first degree murder. In December 2001, the trial court sentenced defendant to 35 years in prison. Defendant appealed, and in August 2003, this court remanded to the trial court to allow defendant to file a motion to reconsider sentence. *People v. Hillsman*, No. 4-01-1104 (Aug. 20, 2003) (unpublished order under Illinois Supreme Court Rule 23). In November 2003, the trial court reduced defendant's sentence to 32 years.

¶ 24    Defendant appealed and challenged his conviction on numerous grounds. This court affirmed defendant's conviction in December 2005. *Hillsman*, 362 Ill. App. 3d at 625.

¶ 25                    B. The First Postconviction Petition

¶ 26    In November 2004, defendant filed a postconviction petition. The trial court summarily dismissed the petition, and on appeal, this court granted the Office of the State Appellate Defender's motion to withdraw, concluding that no meritorious issues could be raised. *People v. Hillsman*, No. 4-04-1059 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 27                    C. The Successive Postconviction Petition

¶ 28    In March 2008, defendant *pro se* filed a second postconviction petition. In February 2009, the trial court appointed counsel to represent defendant. The case then entered a quagmire of various delays. Defendant went through a series of postconviction counsel. One retired, one was appointed as an associate judge, another had a health emergency and subsequently died. Some of his attorneys appeared to pay little attention to his case and to take even less action. However, the relevant proceedings are set forth herein.

¶ 29    Defendant's March 2008 *pro se* petition alleged, among other things, that trial

counsel was ineffective for failing to investigate or present evidence at trial of an alternative explanation for why Fuller's blood ended up on defendant's jeans. Defendant attached three affidavits in support of this allegation, all signed in June or July 2007. Lamar averred that he played basketball with defendant and Fuller on January 29, 2000. At one point, Fuller and defendant both dove for a loose ball, and the two ended up "wrestling with each-other." Fuller cut his hand, which was bleeding so badly that the game had to be stopped until it was bandaged. Lamar further averred that (1) defendant told Lamar that trial counsel would contact him about the incident, (2) Lamar was called as a witness at trial, and (3) trial counsel never asked about the incident either before or at trial. Benjamin and Demetrius Moore signed affidavits that were substantially similar.

¶ 30                              1. *The Second Amended Petition*

¶ 31          In February 2009, the trial court appointed counsel to represent defendant on his successive postconviction petition. In April 2012, defendant, through counsel, filed a document titled "Amended Second Amended Petition for Post-Conviction Relief" (hereinafter, the "amended petition"), which is the subject of the current appeal.

¶ 32                              a. The Ineffective Assistance Claim

¶ 33          In relevant part, the amended petition contained the following claims of ineffective assistance of trial counsel: defense counsel failed to (1) have an expert examine lead residue on defendant's shirt, (2) present expert testimony about defendant's post-traumatic stress disorder as an explanation for his inconsistent statements, and (3) investigate or present evidence of an alternative explanation for why Fuller's blood was on defendant's jeans. These claims mirrored those made by defendant in his *pro se* successive petition, but the amended petition did not attach the same affidavits—or any affidavits—in support of these claims.

¶ 34                              b. The Actual Innocence Claim

¶ 35          The amended petition also alleged that newly discovered evidence from three exculpatory witnesses demonstrated defendant was actually innocent. Affidavits from each of these witnesses were attached. Janelle Woods averred that on the night of January 29, 2000, she and her friend, Chad Coleman, were with Fuller at his apartment. Woods stated that Marquet Newsome, Fuller's next door neighbor, knocked on the door. When Fuller answered it, the two got into a verbal argument about Fuller owing money to Newsome. Newsome told Fuller they should " 'go outside and talk.' " In her affidavit, Woods stated she "saw [Fuller] reach his hand in the inside of the couch where he was sitting and pull out a gun black in color and put it into the side of his sweat pants," before following Newsome out the door.

¶ 36          Woods further stated that she waited with Coleman for about 5 to 10 minutes before she suggested that they check on Fuller. As they approached the window, Woods heard a gunshot and saw Fuller "lying in the snow and [Newsome] standing over him with a gun in his hand." Newsome jogged off, and Woods and Coleman gathered their things and left. Coleman told her "to keep my mouth shut about what we saw, that it was not our business." Woods stated she did not come forward earlier out of fear for her life and her family's lives but she felt compelled to do so now. She signed her affidavit in December 2009.

¶ 37          In an affidavit dated July 2007, Kareem Summers averred that he was in a car with Erwin Watson on January 29, 2000, driving to see a friend named "Burt," who lived on Walnut Street. They arrived at around midnight and saw a dark skinned man, about six feet tall, running down the sidewalk wearing only a white t-shirt and dark pants. Summers stated he remembered the man "because it was very cold out [and] I looked at this guy's face because *** they had to be crazy to be dressed like that on a freezing night."

¶ 38       Summers further stated that he and Watson exited the car and walked to Burt's door. They saw a man lying in the snow and yelled at him to get up, but he did not move or respond. They assumed he was drunk or high. After knocking on Burt's door and receiving no answer, the two left. Summers said he did not go to the police when he learned there was a murder because he did not think he could help. Months later, Summers heard "Shorty Ruff" got arrested for the murder and that Shorty Ruff was really defendant, whom Summers knew from playing basketball with him and his brothers. Summers stated he did not come forward at that time because he was afraid he would get in trouble for not coming forward sooner. In an affidavit dated January 2008, Watson set forth assertions that were substantially similar to Summers's.

¶ 39              2. *The State's Motion To Dismiss*

¶ 40       In December 2012, the State filed a motion to dismiss the amended petition. (We note that the docket sheet reflects that the State filed said motion, but a copy of that motion does not appear in the record.) In April 2014, defendant retained private counsel (hereinafter, "postconviction counsel"). Postconviction counsel did not file any motions, responses, or amended pleadings.

¶ 41       In July 2014, the trial court conducted a hearing on the State's motion to dismiss. The State argued that the trial court never granted defendant leave to file a successive postconviction petition and defendant could not establish cause and prejudice. The State further argued that defendant's claims were barred because they could have been raised on direct appeal or in a prior postconviction petition.

¶ 42       Defendant argued that the trial court had, through its actions, granted defendant leave to file his amended petition because (1) the court appointed counsel and advanced the petition to the second stage and (2) the court's prior orders and the actions of the parties

- 9 -

indicated that defendant had been permitted to actually file the amended petition. Postconviction counsel further argued that claims asserting actual innocence are not subject to forfeiture or the cause and prejudice standard. Regarding the ineffective assistance claim, counsel contended that the errors trial counsel allegedly made could amount to ineffective assistance when considered in light of the newly discovered evidence.

¶ 43    The trial court agreed with defendant, concluding that the court and parties had clearly proceeded on the assumption that the amended petition was properly filed with leave of court.  Additionally, the court noted that defendant asserted claims of actual innocence that were not subject to forfeiture. The court explained that the State's case was primarily circumstantial and, taking the new eyewitness testimony as true, defendant could prove that he was entitled to a new trial. Therefore, the court denied the State's motion to dismiss and set the petition for a third-stage evidentiary hearing on all claims.

¶ 44                    3. *The Evidentiary Hearing*

¶ 45    In October 2014, the trial court conducted a hearing at which postconviction counsel reported that Woods indicated to defendant's family that she was willing to cooperate, but counsel had not been able to speak with her either in person or by phone despite trying for the prior couple of months. Counsel requested a continuance, and the court confirmed with defendant that he was asking for a continuance.

¶ 46    In February 2015, the trial court conducted an evidentiary hearing. Summers testified that he was a Danville resident and knew defendant and defendant's family through playing basketball in the community. Summers did not regularly see defendant, hang out with him, or know him very well. In fact, Summers only knew defendant by his nickname, Shorty Ruff, and did not know his real name.

¶ 47        Summers stated that on January 29, 2000, he was at a bowling alley with Watson and several friends. Summers and Watson left the bowling alley around midnight, when it began to close, and travelled in Summers's car to visit "Burt," otherwise known as Marquet Newsome, who lived on Walnut Street. Summers testified that he "grew up with [Newsome], knew him my whole life." The trip took about three to five minutes.

¶ 48        Summers recalled that it was a cold night; there was a lot of snow on the ground and snow continued to fall. As they approached Newsome's apartment building, Summers saw a six-foot-tall black man, with dark skin, wearing blue jeans, a white t-shirt, and no coat, running in their direction. Summers pointed the man out to Watson because he was so out of place on a cold, snowy night. Summers estimated that he got a 30 to 40 second look at the man. The man turned on Davis Street, and Summers parked his car. Summers testified that he did not recognize the man but could identify him if he saw him again.

¶ 49        After Summers parked, he got out and approached the apartment building. At some point, he noticed a man lying facedown in the snow about 20 feet away in a "gangway." Summers believed the man was passed out drunk or on drugs. Summers yelled about the man to Watson, who remained in the car, and yelled at the man to get up, but the man did not move. Summers stated the man was wearing normal clothes and a coat and he did not see any blood.

¶ 50        Summers testified that he then rang the doorbell to the building, waited for Newsome for about a minute, but left after there was no response. Summers stated that the church parking lot across the street had been plowed but he did not see a plow or snow removal vehicle.

¶ 51        Summers testified that he first heard about the murder from Newsome, who told Summers when they were together the next day. Newsome said a man was shot in the gangway,

and Summers told him he saw someone run away from the scene. Summers never spoke with the police because he did not believe he could provide any useful information and the police would not have known to contact him. Summers later heard defendant was arrested for the murder about "a month, two, after *** it hit the papers." It was at that time Summers learned defendant's real name. Summers testified that when he learned defendant was arrested, he told someone he believed to be defendant's cousin that he did not think defendant was guilty because the person he saw was not defendant, but Summers never heard anything back.

¶ 52    Several years later, Summers was contacted by defendant's mother. Postconviction counsel gave Summers a copy of his affidavit, executed July 13, 2007, and asked him to review it. Summers testified that he signed the affidavit after reviewing it, but he did not type it up. Instead, he was present with defendant's mother and another woman who asked him questions and he told them what to include in the affidavit. Summers concluded his testimony by stating defendant was not the man he saw running away from the crime scene because (1) defendant was much shorter, (2) defendant had much lighter skin, and (3) Summer got a good look at the man's face.

¶ 53    Postconviction counsel then asked the trial court to take judicial notice of Woods's affidavit attached to the amended petition, which the court did. Neither party presented any further evidence.

¶ 54    Postconviction counsel argued that the Woods's affidavit provided the only eyewitness testimony to the crime. Counsel relayed Woods's statements that she was in the apartment when Newsome came over and began arguing with Fuller, Fuller grabbed a gun and went outside to speak with Newsome, Woods heard gunshots and went to the window, and she saw Newsome standing over Fuller with a gun in his hand. Woods did not come forward because

her friend told her "to keep her mouth shut," and Woods feared for her life and her family. Counsel argued that her testimony, coupled with the Summers's testimony—which was largely consistent with Woods and what was presented at trial—was newly discovered and of such a character that it would probably change the outcome at trial. Counsel noted that defendant was not required to prove his innocence, just to present enough evidence to entitle him to a new trial. Counsel also noted that, if this testimony had been available at the time of the original trial, trial counsel may have decided to present the evidence defendant claimed he was ineffective for not presenting, such as an expert on lead residue.

¶ 55          The State agreed defendant did not have to prove his innocence, but defendant did have to prove the evidence would change the outcome. The trial court interjected and noted that the standard was "to be of such a conclusive character that it is more likely than not to change the outcome of the trial." The State replied that the standard essentially meant a showing of not guilty. The court clarified that it was simply looking at whether it was more likely than not "[t]o affect the outcome. Affecting the outcome could be not guilty, guilty of a lesser included." The State agreed with the court's standard and argued that defendant failed to meet his burden.

¶ 56          The trial court took the case under advisement to review the relevant case law and the record.

¶ 57                    4. *The Trial Court's Written Order*

¶ 58          In August 2015, the trial court entered a written order denying defendant's claim for postconviction relief. After recounting the procedural history of the case and a detailed examination of the appropriate standards for successive postconviction petitions and actual innocence claims, the trial court set forth the statements contained in the Woods affidavit. The court concluded it could consider the substance of the allegations contained in that affidavit and

all three of the affidavits constituted newly discovered evidence. The court noted that the weight to be given the affidavits depended upon whether the facts alleged were subject to corroboration by other evidence or testimony. The court then recounted Summers's testimony and the statements from the Watson affidavit. The court further noted that the presence of live testimony "is of greater weight *** than an affidavit submitted some years after the incident." The court concluded that the evidence presented in the affidavits and at the hearing was material and noncumulative. The only question remaining for the trial court was whether the evidence "would probably change the result."

¶ 59        The trial court then set forth in detail the evidence and testimony presented at defendant's jury trial. The court next closely examined case law setting forth and applying the standard of when a defendant is entitled to a new trial upon a claim of actual innocence. The court stated forensic evidence showed Fuller's blood was found on the back of defendant's jeans. Further, petitioner (1) gave several different explanations for how and where he was shot, (2) admitted he fled the area of the shooting, and (3) hid from the police for almost 11 months. The State presented evidence that petitioner appeared at his relative's house in the early morning, wet, covered in blood, and wearing the same clothes as the person seen leaving the scene of the shooting. Others testified that defendant told them he hid a gun, which was retrieved by his brother. Finally, Millis, who was plowing the parking lot across the street, saw two men leave the apartment, one taller and one shorter. Fuller was six feet four inches tall and defendant was five feet six inches tall. Millis described the shorter man as wearing blue jeans and a white t-shirt and stated he saw him running down the street after hearing a gun shot.

¶ 60        The trial court concluded that it "[could] not say the newly discovered evidence, when considered in conjunction with all the other evidence in the case is of the type which courts

would consider sufficient to 'probably change the outcome of the trial.' " The court reasoned as follows:

> "The jury would have to weigh the credibility of the witnesses who now say the shooter was someone else. The Woods affidavit says it was Marquet Newsome, but Summers and Erwin, who were on their way to see Marquet Newsome, and obviously knew what he looked like, did not identify him as the person seen fleeing the scene. This would undoubtedly be significant to the jury at trial. Coupled with the DNA evidence, different versions given by [defendant] and related witnesses admitting conversations with [defendant] about hiding the gun, it is not 'probable' that the outcome would have been different."

¶ 61            Regarding the ineffective assistance claims, the trial court determined that the claims were known to defendant at the time he filed his initial postconviction petition and should have been set forth therein. Accordingly, the claims were barred.

¶ 62            Defendant appealed, but this court remanded the case so postconviction counsel could comply with Rule 651(c). *People v. Hillsman*, No. 4-15-0804 (2017) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 63            This appeal followed.

¶ 64                              II. ANALYSIS

¶ 65            Defendant appeals, arguing postconviction counsel provided unreasonable assistance by failing to (1) amend the successive petition to include allegations to overcome claims of forfeiture and (2) bring to the trial court's attention key facts contained in the affidavit of an eyewitness, entered into evidence at the evidentiary hearing. We disagree and affirm.

¶ 66                      A. The Standard of Review and Applicable Law

- 15 -

¶ 67        The Post-Conviction Hearing Act (Act) provides a criminal defendant the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *People v. Crenshaw*, 2015 IL App (4th) 131035, ¶ 23, 38 N.E.3d 1256; 725 ILCS 5/122-1 (West 2016). The Act contemplates the filing of only one postconviction petition and expressly provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2016). However, a trial court may grant a defendant leave to file a successive postconviction petition if (1) the defendant demonstrates cause for his failure to bring the claim in the initial petition and (2) prejudice results from that failure. *Crenshaw*, 2015 IL App (4th) 131035, ¶ 28. A trial court may also relax forfeiture rules when fundamental fairness so requires. *Id.* ¶ 27.

¶ 68        When a defendant sets forth a claim of actual innocence in a successive postconviction petition, he is excused from showing cause and prejudice. *People v. Ortiz*, 235 Ill. 2d 319, 330, 919 N.E.2d 941, 948 (2009). To succeed on a claim of actual innocence, a defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617.

¶ 69        The right to counsel in postconviction proceedings is statutory rather than constitutional, and therefore, a defendant is entitled only to the level of assistance guaranteed by the Act. *People v. Greer*, 212 Ill. 2d 192, 203, 817 N.E.2d 511, 518-19 (2004). The Illinois Supreme Court has determined that the Act and Rule 651 require appointed counsel to provide only reasonable assistance, a lower standard than that which the constitution requires at trial. *People v. Kuehner*, 2015 IL 117695, ¶ 15, 32 N.E.3d 655. Rule 651(c) outlines certain duties that postconviction counsel must perform to provide reasonable assistance. *Id.* Counsel must (1) consult with the defendant to determine the issues defendant wants to raise, (2) examine the

record of the proceedings in the trial court, and (3) make any amendment to the petition necessary to adequately preserve defendant's contentions. *Id.*

¶ 70 To establish prejudice, a defendant must show that but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 63, 115 N.E.3d 1148. A reasonable probability is a probability which undermines confidence in the outcome of the trial. *Id.* Put another way, the question is whether counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220, 808 N.E.2d 939, 953-54 (2004).

¶ 71                                    B. This Case

¶ 72                    1. *Forfeiture of Ineffective Assistance of Trial Counsel Claims*

¶ 73 Defendant first argues that postconviction counsel was ineffective for failing to amend the petition to include allegations that would overcome any assertions by the State that the claims were forfeited or barred by *res judicata.* Specifically, defendant contends the petition contained three viable claims of ineffective assistance of trial counsel: (1) failure to consult an expert concerning testimony that lead residue was found on defendant's shirt and demonstrated that he was shot at close range, (2) failure to investigate post-traumatic stress disorder as an explanation for defendant's inconsistent statements, and (3) failure to investigate innocent explanations for how Fuller's blood got on defendant's jeans.

¶ 74 As an initial matter, defendant has forfeited any argument regarding the first two grounds for ineffective assistance of trial counsel by failing to develop them in his appellate brief. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Defendant dedicates little more than a page of generic sentiments, applicable to all three claims, that postconviction counsel did not "argue that fundamental fairness required consideration of these issues" or "support *** [the]

- 17 -

allegations with evidence or explain why the necessary evidence was not attached." Defendant correctly notes that (1) postconviction counsel has a duty to attempt to overcome the procedural bars that would prevent the proper presentation of *pro se* claims, including forfeiture, and (2) postconviction counsel did not amend the petition or explain why these ineffective assistance claims were not forfeited. However, defendant provides no argument or explanation regarding (1) whether the first two ineffective assistance of trial counsel claims were in fact not subject to forfeiture or (2) how postconviction counsel could have and should have amended the petition to avoid the application of forfeiture. See *People v. Malone*, 2017 IL App (3d) 140165, ¶ 10, 74 N.E.3d 24 (holding a defendant fails to rebut the presumption of adequate presentation when he "does not make any recommendation as to how counsel could have improved the petition").

¶ 75        By contrast, defendant provides a detailed explanation for why his third claim— that trial counsel was ineffective for failing to investigate an innocent explanation for why the victim's blood was found on his jeans—was not subject to forfeiture. Defendant notes that he attached three affidavits to his *pro se* successive postconviction petition, filed in March 2008, from witnesses that averred that defendant and Fuller played basketball together on the day of the murder. Fuller reportedly cut his hand while wrestling on the ground with defendant over a loose ball. The cut was so bad that a "bandaid or bandage of some kind" was required. Defendant points out that these affidavits were not signed until after his first postconviction petition was dismissed. In addition, postconviction counsel did not attach the affidavits to any amended petition and did not mention them at the evidentiary hearing. Therefore, defendant asserts this claim was not subject to forfeiture and postconviction counsel acted unreasonably by not bringing them to the trial court's attention.

¶ 76        However, as the State points out, the affidavits all state that defendant informed

- 18 -

the affiants that defendant told his trial counsel about the incident, but trial counsel never spoke with them even though defendant told them trial counsel would. In short, the affidavits themselves demonstrate that the claim was known to defendant at the time of his conviction. Defendant could have asserted his trial counsel was ineffective for failing to present this alternative explanation to the jury either on direct appeal or in his first postconviction petition. We cannot say postconviction counsel acted unreasonably by electing to stand on the allegations in the petition rather than bring the deficiency to the trial court's attention. See *id.* ¶ 12 ("Though *People v. Greer* [citation] allows postconviction counsel to withdraw when the allegations of the petition are without merit and frivolous, it does not *compel* withdrawal under such circumstances." (Emphasis in original.)).

¶ 77                              2. *Corroboration of the Woods Affidavit*

¶ 78          Next, defendant claims postconviction counsel was ineffective for failing to point out a specific fact in Woods's affidavit that greatly enhanced its credibility. In particular, defendant contends that Woods described Fuller as placing a black gun in his sweatpants before going outside to talk with Newsome. At trial, the doctor who performed the autopsy mentioned that Fuller was wearing jeans but was accompanied with sweatpants that had been cut or torn off. Defendant asserts that this unusually specific detail gives substantial support to Woods's averment and demonstrates that she was with Fuller at the time of his death. Defendant claims postconviction counsel should have pointed the detail out to the trial court to corroborate Woods's account and increase the weight of her affidavit.

¶ 79          Defendant's observation, though interesting, does not demonstrate that postconviction counsel acted unreasonably. No matter how credible the affidavit was, the trial court was faced with a difficult situation. Woods stated she saw Newsome standing over Fuller

- 19 -

with a gun. However, Summers testified that he "grew up with [Newsome], knew him my whole life," and despite getting a good look at him, could not identify the person running away from the scene. The trial court recognized that even if Woods convincingly testified to a jury that Newsome was the shooter, Summers and Watkins would testify that the man in the white t-shirt was *not* Newsome.

¶ 80     In other words, Summers's testimony was not inconsistent with Millis or the State's theory of the case. Defendant still denied being at the apartment at the time of the shooting. Defendant also gave conflicting stories to the hospital staff and police, disposed of a gun, and was on the run for 11 months. As the trial court recognized, the State's case, though circumstantial, was compelling. Defendant admitted to the police in the hospital and at trial that he was present on Walnut Street at around midnight on January 30 and was shot there. Mary Renee and Katia gave testimony indicating defendant said he was shot while arguing with "some dude."

¶ 81     Nothing in the record indicates that the trial court was unaware of the details of Woods's affidavit. Indeed, based on our review of the transcript, the trial court's written order, and the affidavits, the trial court thoroughly reviewed all the material available to it. We find it difficult to believe postconviction counsel's pointing out that Woods mentioned sweatpants in her affidavit would have altered the trial court's thinking in any way, much less that it would have had such an effect as to cause defendant prejudice by failing to mention it. Given that the standard for effective assistance in postconviction proceedings is markedly lower than at trial, we conclude that postconviction counsel did not render unreasonable assistance by failing to argue that Woods's knowledge that Fuller was wearing sweatpants corroborated the testimony in her affidavit.

¶ 82                    3. *The Actual Innocence Standard*

¶ 83          Finally, defendant argues that postconviction counsel erred by failing to clarify the standard to be applied at a third stage hearing on a claim of actual innocence. Defendant claims the trial court did not recognize that "a different result" includes that only a single juror would have changed her vote. Again, the record demonstrates that the trial court was well versed in the applicable standard and the case law. Indeed, the court interjected to correct the State's assertion that suggested defendant had to prove he would receive a not guilty verdict. Nothing in the record suggests that the court applied too high of a standard or that postconviction counsel's arguing over one specific example of how "a different result" could occur would have changed the trial court's ruling.

¶ 84                         III. CONCLUSION

¶ 85          For the reasons stated, we affirm the trial court's judgment.

¶ 86          Affirmed.