# Illinois Official Reports

## Appellate Court

---

### *People v. Westfall*, 2018 IL App (4th) 150997

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER T. WESTFALL, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0997 |
| Filed<br>Rehearing denied | November 8, 2018<br>November 30, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 13-CF-264; the Hon. John M. Madonia, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Jacqueline L. Bullard, and Salome Kiwara-Wilson, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>John C. Milhiser, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Linda Susan McClain, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Presiding Justice Harris and Justice Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1      In March 2013, the State charged defendant, Christopher T. Westfall, with two counts of criminal sexual assault. 720 ILCS 5/11-1.20(a)(1) (West 2012). The conduct alleged was the following: mouth to vagina (count I) and penis to vagina (count II). The alleged victim was K.W., defendant's estranged wife.

¶ 2      In October 2014, defense counsel filed a motion for mental examination to determine defendant's fitness to stand trial. The trial court granted defense counsel's motion. The court did not conduct a fitness hearing once the results of the mental examination were communicated to the court.

¶ 3      In June 2015, the State filed a motion *in limine* to exclude any reference to K.W.'s mental health at trial. In July 2015, the trial court granted the State's motion. In August 2015, the court modified its ruling so that defendant could cross-examine K.W. on her use of the medication Abilify.

¶ 4      In August 2015, the trial court began defendant's jury trial by conducting *voir dire*, during which the court discussed the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472, 477, 469 N.E.2d 1062, 1064 (1984). The jury found defendant guilty of both counts of criminal sexual assault. In November 2015, the court sentenced defendant to eight years in prison on each count and ordered the sentences to be served consecutively. The court also ordered the circuit clerk to impose "all mandatory fines and fees that must be imposed" and granted the State's request for restitution to be paid to Prairie Center Against Sexual Assault for counseling K.W. had received.

¶ 5      Defendant appeals, arguing (1) the trial court erred because it failed to conduct a fitness hearing after finding that there was a *bona fide* doubt as to defendant's fitness to stand trial, (2) he received ineffective assistance of counsel, (3) the trial court failed to properly question two jurors on the relevant *Zehr* principles, and (4) the trial court improperly entered a civil judgment. We affirm.

¶ 6                          I. BACKGROUND

¶ 7          A. Proceedings Regarding Defendant's Fitness to Stand Trial

¶ 8      In October 2014, defense counsel filed a motion for a mental examination of defendant to determine his fitness to stand trial. In that motion, counsel requested that the trial court appoint a psychiatrist to examine defendant and to render an opinion as to whether defendant was fit to stand trial. See 725 ILCS 5/104-11(b) (West 2014).

¶ 9      In November 2014, when the trial court conducted a hearing on this motion, defense counsel informed the court that he had "*bona fide* doubts" about defendant's ability to assist in his own defense. Counsel stated that, in preparing for trial, he "learned that [defendant] had prior mental health treatment." At that hearing, defendant acknowledged that he had received treatment from mental health professionals 10 years earlier but argued he was fit to stand trial because he was discharged from treatment. The court granted defense counsel's motion and ordered that defendant "be evaluated by Terry M. Killian, M.D. for a mental examination to determine his fitness to stand trial."

¶ 10      In February 2015, the trial court conducted a status hearing at which the following exchange took place:

"THE COURT: What is the status of the evaluation, counsel?

[(DEFENSE COUNSEL)]: Judge, the evaluation I have [*sic*]; but, unfortunately, I didn't bring it with me. [Defendant] is fit. Doctor Killian did [the mental examination to determine fitness]. I have it in my file."

THE COURT: All right. So, we removed any doubt as to the [defendant's] fitness."

¶ 11    In his report, Killian concluded defendant was fit to stand trial within a reasonable degree of psychiatric certainty. Killian noted that defendant demonstrated an adequate understanding of the nature and purpose of the proceedings against him and that he appeared to be able to assist in his defense.

¶ 12                                B. The Mental Health of K.W.

¶ 13    In June 2015, the State filed a motion *in limine* to exclude any reference to K.W.'s mental health, which stated the following:

"During the discovery process in the instant case, a police report from 2006 was tendered to the Defendant. In that police report, K.W. reported that the same Defendant committed a sexual assault against her. Further in the report, there is reference to her mental health. She informed investigators that she suffered from schizophrenia, depression, and [bipolar] disorder. This is the only evidence referencing K.W.'s mental health history possessed by either the State or the Defendant. The mental health history of K.W. is irrelevant to the current charges of criminal sexual assault and should be barred during trial."

¶ 14    In August 2015, the trial court conducted a hearing on the State's motion *in limine*, at which the State argued that it was up to defendant to show the relevance in 2012 (when the alleged sexual assault occurred) of concerns about K.W.'s mental health in 2006. Defendant suggested that K.W.'s mental health and the medications she was taking were relevant to her ability to perceive the alleged sexual assault. Defense counsel also informed the court that defendant told him that defendant had taken K.W. to mental health centers on multiple occasions because she had been having significant mental health problems. The State argued that defendant failed to demonstrate that K.W.'s mental health had any effect on her ability to perceive the alleged attack.

¶ 15    The trial court granted the State's motion but stated that it would allow defendant an opportunity to examine K.W. about her mental health outside the presence of the jury to establish relevance. If defendant could establish relevance, the court would reconsider its ruling.

¶ 16    In August 2015, immediately prior to trial, the trial court gave defendant an opportunity to examine K.W. outside the presence of the jury about her mental health. Defendant offered to stipulate that K.W. was taking Depakote, Compazine, Lexapro, and Abilify to treat schizophrenia, bipolar disorder, and anxiety. After the State refused this stipulation, the court ruled that defendant would have to prove relevance through K.W.'s testimony out of the jury's presence.

¶ 17    K.W., who was 42 years old at the time of trial, then testified that she was diagnosed with schizophrenia, bipolar disorder, and anxiety when she was 17 years old. K.W. stated that she was prescribed Depakote, Abilify, and Lexapro. She noted that the Abilify was to help her sleep at night and that it may have affected her ability to stay awake. K.W. denied that the

Depakote and Lexapro affected her ability to perceive events. K.W. stated that she has no memory or perception problems.

¶ 18   Based upon this testimony, the trial court ruled that defendant could cross-examine K.W. on her use of Abilify and how it may have affected her ability to perceive events. However, the court excluded cross-examination regarding her mental health and her use of other prescription drugs.

¶ 19                                    C. Jury Selection

¶ 20   Jury selection for defendant's trial began in August 2015. Illinois Supreme Court Rule 431(b), which codified the principles established in *Zehr*, 103 Ill. 2d at 477, requires a trial court to ask all potential jurors whether they *understand* and *accept* that (1) the defendant is presumed innocent, (2) the State bears the burden of proving the defendant guilty beyond a reasonable doubt, (3) the defendant has no obligation to present evidence, and (4) the defendant's choice to not testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). During jury selection, the court did not ask one of the jurors about the *Zehr* principles and did not ask another juror whether he *accepted* that the State has the burden of proving defendant guilty beyond a reasonable doubt.

¶ 21                                    D. The Jury Trial
¶ 22                                 1. *The Alleged Attack*
¶ 23   K.W. testified that on July 26, 2012, at approximately 1 a.m., she was arguing with defendant over the phone. K.W. noted that she was married to defendant but they had been living separately since 2011. K.W. stated that defendant asked to come over to her house, and she agreed so that they could talk in person. Defendant arrived at her home at approximately 1:45 a.m.

¶ 24   Upon arriving at her home, defendant continued to argue with K.W. After a while, they stopped arguing and simply watched television together on the sofa. Defendant was drinking alcohol and eventually fell asleep. K.W. later fell asleep as well.

¶ 25   K.W. awoke when defendant grabbed her pants and began wrestling with her. K.W. ultimately ended up on the floor. As they struggled, she told defendant to stop and that she was on her period. She testified that defendant responded by telling her to shut up and then bit her on her left hip and bit her vagina. K.W. started screaming and continued to struggle, and defendant later put his penis inside her vagina and had sex with her. K.W. passed out during this encounter. K.W. also testified that defendant "shoved [his hand] inside her," cutting her vagina. As a result of that and his biting her, she had two different cuts in her vagina.

¶ 26   K.W. woke up the next morning to find defendant asleep on the couch. She found a hammer and chased him out of her house. K.W. eventually called defendant's mother to discuss what happened. Around 2 p.m., she called the police to report the sexual assault. After the police arrived, she was taken to the hospital for a sexual assault evaluation.

¶ 27                          2. *The Investigation and Interrogation Video*
¶ 28   Kate Figueira, a police officer with the city of Springfield, testified that she was dispatched to a reported sexual assault on July 26, 2012, at approximately 3 p.m. She noted that officers had already arrived at K.W.'s residence but K.W. had requested a female officer. Although

Figueira stated that K.W. claimed that defendant had sexually assaulted her, Figueira did not see any injuries to K.W.'s neck or face. Figueira stated that K.W. was visibly upset and was later taken to the hospital for a sexual assault evaluation.

¶ 29 Holly O'Neal, a nurse at St. John's Hospital, testified that she performed a sexual assault evaluation on K.W. During this process, O'Neal collected physical evidence found on K.W. and on K.W.'s menstrual pad. O'Neal stated that K.W. was erratic during the evaluation. O'Neal testified that K.W. had a small laceration on her labia but, on cross-examination, conceded that the injury could have been accidentally self-inflicted. O'Neal testified that she did not notice any abrasions or bruises on K.W.'s face and there were no bite marks on K.W.'s hip.

¶ 30 Joshua Stuenkel, a police officer with the city of Springfield, was assigned to investigate the alleged sexual assault. In September 2012, Stuenkel and Detective Rick Dhabalt interrogated defendant and took a DNA sample from him. The video of defendant's interrogation was played for the jury.

¶ 31 On the interrogation video, defendant stated that he was married to K.W. but that they were separated. Defendant initially stated that he had not been at K.W.'s residence for at least six months and that he had not had sex with K.W. in about six months. He later stated that he had been to K.W.'s house approximately a month earlier to talk with her. Defendant explained that because K.W. was acting funny, he left her home without incident. Defendant went on to admit that there "was starting to be a dispute, then I was just trying to kiss up on her a little bit." Defendant stated that he only kissed her on the mouth and that they did not have sex. Defendant later admitted to "kissing all over her" but stated that he did not kiss her below the waist. The following exchange later took place:

"DHABALT: [T]here's some injuries to her body as well, um, you know that if it happened the way you told it, it wouldn't be possible. Specifically a bite inside of her vagina. Any chance that came from you?

DEFENDANT: No[,] I licked on it a little bit but that wasn't, I figure that wasn't nothing.

STUENKEL: Okay[,] I mean cause now we've gotten to another progression, because a minute ago [there was] nothing below the waist. Nothing below the waist, remember? That's what you said. And I asked you.

Defendant: That's at the waist, well, I guess.

STUENKEL: I mean[,] that's below the waist. Um, and now you licked on her a little bit. Did, did you maybe bite her?

DEFENDANT: Nope.

STUENKEL: Any penetration with your fingers?

DEFENDANT: No, just rubbed a little bit.

STUENKEL: Little rubbing? Did she find that uncomfortable?

DEFENDANT: (shaking head no) Nuh huh.

STUENKEL: She never yelled, never screamed, never told you to stop?

DEFENDANT: (shaking head no) Nope.

DHABALT: You never had intercourse with her?

DEFENDANT: Well, if you consider me giving tongue or kissing on a body.

DHABALT: No, that's not intercourse, intercourse is the penis inside the vagina. You never did that?

DEFENDANT: (shaking head no).

* * *

DHABALT: No? Didn't have that? And you didn't stick your finger in her?

DEFENDANT: No, I stuck my finger in her but I didn't you know what I'm saying, like you don't see me just grab her or nothing.

STUENKEL: I didn't say you grabbed her.

DEFENDANT: Oh.

* * *

DEFENDANT: I didn't bite her.

STUENKEL: And you never had sex with her?

DEFENDANT: Nope[,] just licked a little stuff like that.

* * *

STUENKEL: Well I'll tell you *** [she] goes to the hospital, they do a kit, a kit involves them taking swabs from her body, photographs, um collecting clothing, and they recover semen from her. Okay? Is that gonna be yours?

DEFENDANT: Um[,] I doubt it, I don't know.

STUENKEL: Did you have sex with her?

DEFENDANT: (shaking head no).

STUENKEL: Then how is your semen gonna be in [her]?

DEFENDANT: I don't know, shit, I mean past times that I've had sex with her.

* * *

STUENKEL: That, if it's there, that's what you're saying it's from, it's from the previous contact when she was living with you at least six months ago?

DEFENDANT: Probably."

¶ 32                    3. *The DNA Evidence*

¶ 33     Jennifer Acosta-Talbot, a DNA analyst for the Illinois State Police, testified that she received K.W.'s sexual assault kit and discovered bodily fluids on K.W.'s menstrual pad. She used three tests to determine the source of the fluids. The first test, an acid phosphate test, showed a positive result for semen. The second test, known as a P-30 test, demonstrated that "[s]emen is indicated on the stains on the pad." The third test consisted of viewing the sample under a microscope, and Acosta-Talbot testified that she did not observe sperm cells under the microscope. Defense counsel did not cross-examine Acosta-Talbot.

¶ 34     Karri Broaddus, a forensic scientist for the Illinois State Police, testified that she performed a DNA analysis on the body fluids found on the menstrual pad. Broaddus testified that a male DNA profile existed from which defendant could not be excluded. Broaddus testified that only 1 in 61 trillion blacks, 1 in 280 trillion whites, and 1 in 160 trillion Hispanics would not be excluded as the contributor of the male DNA found on K.W.'s menstrual pad. Defense counsel did not cross-examine Broaddus.

¶ 35                                                   4. *The Defense Case*

¶ 36        Defendant elected not to testify, and the defense presented no evidence.

¶ 37                                                   5. *Closing Arguments*

¶ 38        During closing argument, relying especially upon the DNA evidence and the interrogation video, the State argued that it had proved defendant guilty beyond a reasonable doubt. Defense counsel, however, argued that the State had failed to prove defendant guilty because the physical evidence was so weak. Counsel highlighted that K.W. did not have any bruises or other visible signs of an altercation. Counsel also pointed out that the small laceration on K.W.'s labia could have been self-inflicted. Counsel also highlighted the timeline discrepancy of the alleged attack, which supposedly occurred at approximately 2 a.m. yet K.W. failed to report the crime until approximately 2 p.m.

¶ 39        Defense counsel also attacked the probative value of the interrogation video, arguing as follows:

> "And then we had the showing of [defendant's] statement. I would suggest to you that [defendant] was naïve, unsophisticated, probably felt scared and maybe wasn't too smart[.] *** Now, he could have exercised his right to remain silent and [asserted his] Miranda [rights]. But, better yet, he could have just told them the truth. They gave him every opportunity to say it was consensual. *** That's exactly what it was. *** So, *** remember the circumstances upon which [his statement] was given. This isn't a college educated high IQ guy who has experience in these matters. This is a gentleman who is inexperienced, who's put in an environment where he made all kinds of mistakes. All kinds. But that doesn't make him a rapist. That doesn't make him guilty of attacking his wife."

¶ 40        Defense counsel concluded his argument by asserting that defendant and K.W. had consensual sexual relations, arguing as follows:

> "The conclusion to this case is this, and this is supported by the physical evidence and by much of the testimony[.] [Defendant] went over by invitation at 2 *** in the morning to his wife's house. They visited. They talked. One thing led to another[.] [T]hey had consensual sexual relations that [were] not forced. He left. She became upset. It didn't go the way that she wanted. She called the police. And the State's problem is, again, where is the physical evidence to support what happened? This is not a case of rape."

¶ 41                                          6. *The Jury's Question and Verdict*

¶ 42        After jury deliberations began, the jury sent a note to the trial court that read "[w]hich test came back positive for semen? Or was the [p]ositive sample just of bodily fluids?" The court, without objection from either the State or defendant, instructed the jury that this question was a factual determination for it to decide. Ultimately, the jury found defendant guilty of both counts of sexual assault.

¶ 43                                E. The Motion for a New Trial and Sentencing

¶ 44        In August 2015, defendant filed a motion to a new trial, arguing (1) the trial court erred by barring cross-examination on K.W.'s use of Depakote and Lexapro and (2) the State failed to

prove defendant guilty beyond a reasonable doubt. In November 2015, the trial court denied the motion for a new trial, sentenced defendant to eight years in prison on each count of criminal sexual assault, and ordered those sentences to be served consecutively. The court also ordered the circuit clerk to impose "all mandatory fines and fees that must be imposed."

¶ 45 The State, by oral motion, requested that "a civil judgment be entered in the amount of $6,800 to benefit the Prairie Center Against Sexual Assault for the counseling that [K.W.] has received." The trial court granted this request, concluding that "[t]he State's request for restitution by way of a civil judgment in the amount of $6,800 *** will be granted and will be a part of the judgment and sentence imposed in this case." Defendant filed a motion to reconsider in December 2015, in which defendant argued only that the court should reconsider the length of his prison sentence. Later that month, the court denied the motion to reconsider.

¶ 46 This appeal followed.

## II. ANALYSIS

¶ 48 Defendant appeals, arguing (1) the trial court erred because it failed to conduct a fitness hearing after finding that there was a *bona fide* doubt as to defendant's fitness to stand trial, (2) he received ineffective assistance of counsel, (3) the trial court failed to properly question two jurors on the relevant *Zehr* principles, and (4) the trial court improperly entered a civil judgment. We address these issues in turn.

## A. Defendant's Fitness

¶ 50 Defendant first argues that the trial court erred because it failed to conduct a fitness hearing after it found that there was a *bona fide* doubt as to defendant's fitness to stand trial. We disagree, concluding that the trial court never found that a *bona fide* doubt existed. Accordingly, the trial court was not required to conduct a fitness hearing.

## 1. *The Applicable Law*

¶ 52 The due process clause prohibits the prosecution of a defendant who is unfit to stand trial. *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 20, 68 N.E.3d 942. A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purposes of the proceedings against him or to assist in his defense. 725 ILCS 5/104-10 (West 2012). A defendant is presumed to be fit. *Id.* In relevant part, section 104-11 of the Code of Criminal Procedure of 1963 (Code) states as follows:

"(a) The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further.

(b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a *bona fide* doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case." *Id.* § 104-11(a), (b).

¶ 53    In *People v. Hanson*, 212 Ill. 2d 212, 222, 817 N.E.2d 472, 477 (2004), the supreme court concluded that "[t]he mere act of granting a defendant's motion for a fitness examination cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt of the defendant's fitness." The supreme court further concluded that "if after the [fitness] examination the trial court finds no *bona fide* doubt, [then] no further hearings on the issue of fitness would be necessary." *Id.* at 217.

¶ 54    A *bona fide* doubt exists when the facts raise a real, substantial, and legitimate doubt regarding a defendant's mental capacity to meaningfully participate in his defense. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 72, 64 N.E.3d 28. Relevant factors that the trial court may consider in assessing whether a *bona fide* doubt exists include (1) the defendant's behavior and demeanor, (2) prior medical opinions regarding the defendant's competence, and (3) defense counsel's representations about the defendant's competence. *People v. Rosado*, 2016 IL App (1st) 140826, ¶ 31, 61 N.E.3d 1132. If the trial court concludes that no *bona fide* doubt exists, then it need not conduct a fitness hearing. *Hanson*, 212 Ill. 2d at 217. Whether a *bona fide* doubt exists is an objective and fact-specific inquiry left to the discretion of the trial court. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 123, 984 N.E.2d 1025. A trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would take the view adopted by the trial court. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26, 82 N.E.3d 693.

¶ 55                                    2. *This Case*

¶ 56    In this case, defense counsel filed a motion for a mental examination of defendant to determine his fitness to stand trial. Although counsel did not cite to a specific statute, his motion mirrored the language of section 104-11(b) of the Code. See 725 ILCS 5/104-11(b) (West 2014). The trial court granted defense counsel's motion and ordered that defendant be evaluated "for a mental examination to determine his fitness to stand trial." In so ordering, the court did not cite to a specific statute, but the language of its order again mirrored the language of section 104-11(b). See *id.* Significantly, the court never made an explicit finding that there was a *bona fide* doubt regarding defendant's fitness to stand trial. See *id.* § 104-11(a). The absence of such a finding no doubt explains why the court did not conduct a fitness hearing once the results of the mental examination were communicated to the court.

¶ 57    Defendant argues that the trial court erred because it failed to conduct a fitness hearing after it found that there was a *bona fide* doubt as to defendant's fitness to stand trial. We disagree. First, the trial court merely granted defense counsel's motion for a fitness examination. Granting this motion cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt as to defendant's fitness. *Hanson*, 212 Ill. 2d at 222. Second, the court never made a finding that it had a *bona fide* doubt regarding defendant's fitness. Third, based on the record in this case, we conclude that the trial court did not abuse its discretion in failing to find that a *bona fide* doubt existed regarding defendant's fitness. Accordingly, the trial court was not required to conduct a fitness hearing. *Id.* at 217.

¶ 58                            B. Ineffective Assistance of Counsel

¶ 59    Defendant next argues he received ineffective assistance of counsel because defense counsel (1) failed to cross-examine the State's expert witnesses on the strength of the DNA evidence and (2) was unable to cross-examine K.W. regarding her mental health and some of

her prescription drug use. We disagree.

¶ 60                                    1. *The Applicable Law*

¶ 61      The sixth amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding. *People v. Beasley*, 2017 IL App (4th) 150291, ¶ 26, 85 N.E.3d 568. To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was (1) deficient and (2) prejudicial. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10, 93 N.E.3d 664.

¶ 62      To establish deficient performance, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Id.* Judicial review of counsel's performance is highly deferential. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671. A defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011). The decision of whether and how to conduct a cross-examination is generally a matter of trial strategy. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 26, 105 N.E.3d 996. Strategic choices are virtually unchallengeable. *Manning*, 241 Ill. 2d at 333.

¶ 63      To establish prejudice, the defendant must show that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. *People v. Houston*, 229 Ill. 2d 1, 4, 890 N.E.2d 424, 426 (2008). A reasonable probability is defined as a probability which undermines confidence in the outcome of the trial. *Id.*

¶ 64      Failure to satisfy either prong negates a claim of ineffective assistance of counsel. *People v. Fellers*, 2016 IL App (4th) 140486, ¶ 23, 77 N.E.3d 994. When a claim of ineffective assistance of counsel was not raised at the trial court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24, 42 N.E.3d 885.

¶ 65                                        2. *This Case*

¶ 66      Defendant first argues that defense counsel should have cross-examined the State's expert witnesses regarding the strength of the DNA evidence. Defendant highlights that Acosta-Talbot, a DNA analyst for the Illinois State Police, testified that she did not observe sperm cells under the microscope. Further, as evidenced by the jury's note to the trial court, defendant highlights that the jury was apparently confused about the DNA evidence. However, in this case, K.W. and defendant were an estranged married couple, and K.W. had invited defendant over to her home in the middle of the night. Rather than attack the strength of the DNA evidence, defense counsel argued that defendant had consensual sexual relations with K.W. Under the facts of this case, this was an entirely reasonable trial strategy that is virtually unchallengeable on appeal. *Manning*, 241 Ill. 2d at 333.

¶ 67      Defendant next argues that defense counsel was deficient because he was unable to cross-examine K.W. regarding her mental health and some of her prescription drug use. In this case, counsel unsuccessfully argued against the State's motion *in limine*. However, counsel later examined K.W. outside the presence of the jury in an attempt to establish the relevance of her mental health and prescription drug use. As a result, defense counsel persuaded the trial court to modify its prior grant of the State's motion *in limine* to allow cross-examination of K.W.'s use of Abilify and how this may have affected her ability to perceive events. We

- 10 -

conclude that counsel provided effective assistance regarding K.W.'s mental health and her prescription drug use. Accordingly, because defendant fails to prove deficient performance, his claim of ineffective assistance of counsel fails. *Fellers*, 2016 IL App (4th) 140486, ¶ 23.

¶ 68                                    C. The *Zehr* Principles

¶ 69       Defendant next argues the trial court committed reversible error when it failed to properly question two jurors as required under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant concedes that he forfeited this argument but argues he can prevail under the first prong of the plain-error doctrine. We disagree.

¶ 70                                    1. *The Applicable Law*

¶ 71       Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), which codified the *Zehr* principles, requires a trial judge to ask all potential jurors whether they *understand* and *accept* that (1) the defendant is presumed innocent, (2) the State bears the burden of proving the defendant guilty beyond a reasonable doubt, (3) the defendant has no obligation to present evidence, and (4) the defendant's choice to not testify cannot be held against him.

¶ 72       To preserve an alleged error for appeal, a defendant must object at trial and file a written posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27, 996 N.E.2d 575. Failure to do either results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675.

¶ 73       The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider an unpreserved error when (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Ely*, 2018 IL App (4th) 150906, ¶ 15, 99 N.E.3d 566.

¶ 74       The usual first step under either prong of the plain-error doctrine is to determine whether there was an error at all. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 17, 93 N.E.3d 597. When a defendant claims first-prong error, he must prove that an error occurred and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Id.* ¶ 26. When determining whether the evidence is closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53. The evidence is closely balanced if "the outcome of this case turned on how the finder of fact resolved a 'contest of credibility.' " *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07, 893 N.E.2d 653, 667 (2008)). A "contest of credibility" exists when (1) both sides presented a plausible version of events and (2) there is no extrinsic evidence to corroborate or contradict either version. *Id.* ¶¶ 60-63. If the defendant meets his burden under the first prong, he has demonstrated actual prejudice, and his conviction should be reversed. *Id.* ¶ 51. The second-prong of the plain-error doctrine is not available for a Rule 431(b) violation unless there is evidence that the violation produced a biased jury. *Id.* ¶ 52.

¶ 75       The defendant bears the burden of persuasion at all times under the plain error doctrine. *People v. Suggs*, 2016 IL App (2d) 140040, ¶ 61, 57 N.E.3d 1261. If the defendant fails to meet his burden, the issue is forfeited, and the reviewing court will honor the procedural default. *People v. Ahlers*, 402 Ill. App. 3d 726, 734, 931 N.E.2d 1249, 1255 (2010).

¶ 76                                    2. *This Case*

¶ 77        Defendant argues the trial court failed to admonish the jury as required under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). During jury selection, the court did not ask one of the jurors about the *Zehr* principles and did not ask another juror whether he *accepted* that the State has the burden of proving defendant guilty beyond a reasonable doubt. Thus, defendant is correct that the court erred by not complying with Rule 431(b).

¶ 78        We reiterate that Rule 431(b) "ensures that members of the jury understand and accept the bedrock principles of Anglo-American criminal law. Failing to comply with Rule 431(b) could threaten the integrity of the jury's verdict or, at the very minimum, cast doubt on any guilty verdict a jury might return." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35, 92 N.E.3d 494. A trial court *must* instruct the jury pursuant to Rule 431(b) and *must* not deviate in any way from the *precise language chosen* by the Illinois Supreme Court. *Id.*

¶ 79        Defendant contends that the evidence was closely balanced on his conviction for aggravated criminal sexual assault (mouth to vagina) but concedes that the evidence was not closely balanced for his conviction for aggravated criminal sexual assault (penis to vagina).

¶ 80        Nonetheless, defendant's argument fails because the evidence was not closely balanced on his conviction for aggravated criminal sexual assault (mouth to vagina). During the interrogation video, defendant contradicts himself numerous times. Defendant initially states that he was never at K.W.'s house during the night of the alleged assault. He later admits to going to her house but claims to have only kissed her. Defendant later admits to "kissing all over her" but states that he did not kiss her below the waist. Still later, defendant admits to placing his mouth on her vagina but claims that he did not bite her. The nurse who examined K.W., however, testified that she observed a scratch on K.W.'s labia. Defendant also claims that he did not have sex with K.W., but according to the testimony of the State's witnesses, his semen was found on K.W.'s menstrual pad.

¶ 81        The version of events defendant argues on appeal was contradicted by his own statements to the investigating officers and the physical evidence. Therefore, unlike in *Sebby*, 2017 IL 119445, ¶¶ 60-63, defendant fails to demonstrate that the evidence was closely balanced. Accordingly, the issue of the trial court's failure to comply with Rule 431 is forfeited, and we honor defendant's procedural default. *Ahlers*, 402 Ill. App. 3d at 734.


¶ 82                                    D. Civil Judgment

¶ 83        Last, defendant argues that the trial court erred when it granted the State's request for restitution for the benefit of the Prairie Center Against Sexual Assault. First, defendant argues that this was an improper civil judgment instead of restitution. Second, assuming it was restitution, defendant argues that the trial court should have taken into consideration defendant's ability to pay and set a payment schedule.

¶ 84        Section 5-5-6 of the Unified Code of Corrections (Unified Code) authorizes trial courts to order restitution to victims of crime "and any other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant." 730 ILCS 5/5-5-6(b) (West 2014). In *People v. Strebin*, 209 Ill. App. 3d 1078, 1085, 568 N.E.2d 420, 424-25 (1991), this court reasoned that agencies providing counseling services can be awarded restitution under section 5-5-6(b) of the Unified Code.

¶ 85     Section 5-4.5-50(d) of the Unified Code requires a defendant to challenge "the correctness of a sentence or to any aspect of the sentencing hearing *** [in] a written motion filed with the circuit court clerk within 30 days following the imposition of sentence." 730 ILCS 5/5-4.5-50(d) (West 2014). If a defendant fails to include an argument in the motion, the issue is forfeited. *People v. Tyus*, 2011 IL App (4th) 100168, ¶¶ 85, 87, 960 N.E.2d 624. A reviewing court will not review a forfeited sentencing issue, such as restitution, unless the error is sufficiently grave that it deprived the defendant of a fair sentencing hearing or it affected the defendant's substantial rights. *People v. Hanson*, 2014 IL App (4th) 130330, ¶ 40, 25 N.E.3d 1. "[I]t is not a sufficient argument for plain error review to simply state that because sentencing affects the defendant's fundamental right to liberty, any error committed at that stage is reviewable as plain error." *People v. Rathbone*, 345 Ill. App. 3d 305, 311, 802 N.E.2d 333, 338 (2003).

¶ 86     In this case, the State requested that "a civil judgment be entered in the amount of $6,800 to benefit the Prairie Center Against Sexual Assault for the counseling that [K.W.] has received." The trial court granted this request, concluding that "[t]he State's request for restitution by way of a civil judgment in the amount of $6,800 *** will be granted and will be a part of the judgment and sentence imposed in this case." Defendant filed a motion to reconsider in which defendant argued only that the court should reconsider the length of his prison sentence.

¶ 87     We first conclude that the trial court granted restitution under the Unified Code rather than an improper civil judgment. 730 ILCS 5/5-5-6(b) (West 2016); *Strebin*, 209 Ill. App. 3d at 1085. Second, although the trial court should have assessed defendant's ability to pay and set a payment schedule, defendant has forfeited this argument by failing to include it in his motion to reconsider. *Tyus*, 2011 IL App (4th) 100168, ¶ 85. Finally, plain-error review is not available because defendant fails to demonstrate that the trial court's omission deprived him of a fair sentencing hearing or affected his substantial rights. *Hanson*, 2014 IL App (4th) 130330, ¶ 40. Accordingly, we reject defendant's argument.

¶ 88                                     III. CONCLUSION
¶ 89     For the reasons stated, we affirm the trial court's judgment.

¶ 90     Affirmed.