**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170535-U

Order filed October 30, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-17-0535 |
| v. | ) ) | Circuit No. 14-CF-139 |
| CURTIS L. PLUMB, | ) ) ) | Honorable Jeffrey W. O'Connor, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice Schmidt and Justice McDade concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) did not result in reversible error under plain error review because the trial evidence was not closely balanced.

¶ 2     The defendant, Curtis L. Plumb, appeals his conviction for aggravated driving under the influence of alcohol (DUI). The defendant argues that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The State agrees that the court failed to

comply with Rule 431(b), but contends that the issue is forfeited and that the error is not reversible under plain error review.

¶ 3                                    I. BACKGROUND

¶ 4        The defendant was charged with aggravated DUI (625 ILCS 5/11-501(a)(2), (d)(1)(A), (d)(2)(D) (West 2014)). The matter proceeded to a jury trial. Before the close of the State's evidence, the defendant moved for a mistrial on the basis that the potential jurors had not been sworn in before the beginning of the *voir dire* process. The court granted the motion. A second jury trial resulted in a hung jury, and the court declared a mistrial.

¶ 5        A third jury trial was held. During the jury selection process, the court stated that it would go over some basic propositions of criminal constitutional law. Specifically, the court stated:

> "[T]he State has the burden of proving the defendant guilty of this charge, and
> their burden is beyond a reasonable doubt. That's for the jury to decide if that
> standard has been met. [The defendant] is presumed to be innocent of this charge,
> and he is not tasked with proving his innocence."

The court also stated that the defendant was not obligated to testify during the trial. The court stated that if the defendant did not testify, it could not be used against him as evidence of his guilt.

¶ 6        The prospective jurors were sworn in. Of the prospective jurors that were ultimately selected to serve on the jury, the court asked three jurors if they agreed with and would apply the constitutional propositions the court had previously discussed. The court asked another juror if she had heard and understood the constitutional provisions, if she believed in them, and if she would apply them. The court asked two other jurors if they understood, accepted, and would apply the principles of the burden of proof beyond a reasonable doubt, the presumption of

2

innocence, and that it could not be held against the defendant if he chose not to testify. The court asked another juror if he heard, believed in, and would apply the constitutional principles it had previously discussed. The court asked another juror if he understood, believed in, and would apply the constitutional principles it had previously discussed.

¶ 7    The court asked two additional prospective jurors who were ultimately selected if they believed in and would apply "the constitutional propositions of presumption of innocence, proof beyond a reasonable doubt, and the decision to testify." The court asked the next juror ultimately selected if he heard and recognized the four basic principles of constitutional law that applied to the case. The court also asked that juror if he appreciated, accepted, and would apply those principles. The court asked the final juror who was ultimately selected if she understood the four constitutional propositions that he had questioned the other prospective jurors on. The court asked her if she believed in those principles and if she would apply them in this case. An alternate juror was selected, but the court did not ask him any of the questions required by Rule 431(b).

¶ 8    The State called Sandra Smith as a witness. Smith testified that she lived with her husband in an earth shelter house that was located on a private, gravel lane off a highway. The private lane led to three houses, including Smith's house. One of the other houses on the lane was an A-frame house. Smith identified several photographs of her house and the surrounding area.

¶ 9    In the late afternoon on May 13, 2014, Smith looked through her living room window and saw a stranger drive up to her residence in a pickup truck. Smith identified the defendant in court as the driver of the truck. The defendant exited the truck approximately one minute after stopping it in front of her house. He had difficulty getting out of the truck, and he had a "[h]ard

time straightening up" after he exited the truck. Smith opened the door to her house and asked the defendant if she could help him. After 10 to 15 seconds, the defendant said he had built the house and just wanted to come back and see it. The defendant's speech was slow and slurred. The defendant's explanation for why he was there did not make sense to Smith. Smith told the defendant that she and her husband had built the house. She told the defendant that he did not belong there, and he should leave.

¶ 10     The defendant did not respond and began walking toward Smith's front door. Smith asked the defendant to leave, and she said she would call the police if he did not. The defendant began walking toward the garage. Smith shut the front door and the garage door. Smith then saw the defendant walk toward her barn. He was swaying back and forth as he walked. Smith called the police, described the defendant and his truck, and read the defendant's license plate number. She rapped on her patio door and held up her cell phone to show the defendant that she was calling the police. The defendant walked back to his truck and drove away toward the highway.

¶ 11     Smith left her house to go to work approximately three to four minutes after the defendant left. She stopped her vehicle because she saw that the defendant's truck was in the ditch on the side of the road. Smith called the police, and the dispatcher told Smith that they had the defendant in custody.

¶ 12     Smith opined that when she encountered the defendant on the day of the incident, he "was in some way altered, be it alcohol, be it drugs, be it something." The prosecutor asked Smith what she meant by "altered." Smith replied, "Inebriated, high, under the influence of, just not—not sober." Smith based her opinion on the defendant's body movements and speech. Smith said that she had worked in the food and beverage industry for 14 years, and she had seen individuals consume too many alcoholic beverages in both work and social settings.

4

¶ 13     Roger Cherry testified that he was working as a deputy sheriff on the day of the incident. Cherry was dispatched to a lane off of a highway that led to several residences. The dispatch information included a description of a vehicle and the license plate number. Cherry was nearby, and he arrived at the location approximately three minutes after receiving the dispatch. Cherry located a pickup truck matching the description he had been given stuck in a ditch on the lane. Cherry saw a man approximately 50 yards north of the truck walking in the middle of the road. Cherry drove up to the man, and he recognized him as the defendant. Cherry knew the defendant prior to the date of the incident.

¶ 14     Cherry approached the defendant and spoke to him. The defendant said that he had been looking at a house that he had helped build. This did not make sense to Cherry. The defendant said that "he didn't make the corner," and his truck was stuck. The defendant was going to the next residence to borrow a tractor and chain to pull his truck out. The defendant could not stand up without side stepping for balance. The defendant was wobbling, his head was bobbing, and his speech was slurred. Cherry also observed that the defendant had urinated on himself. Cherry stated that this was obvious, as there was a dark, wet patch a short distance below the defendant's belt line going through the inside of his jeans.

¶ 15     Cherry asked the defendant what and how much he had been drinking. The defendant gave various answers. The defendant said that he was drinking moonshine and that he was drinking apple pie. The defendant also said that he was having girlfriend issues and was "drinking away a woman." The defendant said he had bought two jars of moonshine and that they were in the cab of his truck. Cherry asked the defendant to perform field sobriety tests. The defendant attempted to complete the one legged stand test, but he could not raise his leg without

5

falling. At that point, Cherry stopped the field sobriety testing for safety purposes and arrested the defendant.

¶ 16        It was Cherry's opinion that the defendant was highly intoxicated. Cherry based his opinion on the fact that the defendant had the odor of an alcoholic beverage on his breath, had "mumbled" speech, admitted that he had drunk alcohol, was unable to stand in place, was unable to keep his head up, had no balance, and said things that did not make sense. Cherry found a jar of apple pie moonshine in the defendant's truck that was two-thirds empty.

¶ 17        Cherry waited for a tow truck to arrive and then transported the defendant to the county jail. While Cherry was waiting for the tow truck, the defendant yelled and beat his head on the window in the back of Cherry's squad car. This occurred six or seven times. The defendant also acted happy and carefree at times. When Cherry and the defendant arrived at the jail, the defendant refused to take a breathalyzer test.

¶ 18        Deputy Corey Hixson testified that he was dispatched to the county jail on the evening of the incident to run the breathalyzer machine on the defendant. Hixson observed that the defendant had bloodshot eyes, slurred speech at times, and the odor of an alcoholic beverage on his breath. Hixson stated that the defendant confused him for a different officer several times even though Hixson had had many conversations with the defendant in the past. The defendant ultimately refused to submit a breath sample. Hixson opined that the defendant was under the influence of alcohol at that time.

¶ 19        The defendant testified on his own behalf. The defendant stated that he was driving to a friend's house on the afternoon of the incident. On the way, he decided to stop to take photographs of an A-frame house that he helped build 30 years earlier. The defendant was looking for work, and he wanted the photographs for his resume. The road leading to the A-

6

frame house from the highway was gravel with ruts. The defendant said that there was a washout on one side of the road, which caused him to favor the other side.

¶ 20      The defendant testified that he saw Smith at the A-frame house. Smith was outside the A-frame house on the patio or sidewalk. The defendant did not recall if he saw her exit the A-frame house, though he believed he had testified at a prior proceeding that she had exited the house. The defendant testified that he was familiar with an earth shelter house in the area, but he did not stop at that house. Smith told the defendant to leave or she would call the police. The defendant turned around to leave and yelled back at her that he helped build the house 30 years earlier. The defendant immediately returned to his truck. He did not walk around the property. The defendant had not consumed any alcoholic beverages before he arrived at the A-frame house.

¶ 21      As the defendant was leaving the area where the A-frame house was located, he stopped his vehicle because he was experiencing pain due to a migraine and his vision was becoming blurred. The migraine had been progressing during his excursion at the A-frame house. The defendant said he thought his migraine "might have been" progressing before he turned off the highway to visit the A-frame house. The prosecutor asked the defendant why he would take a detour to the A-frame house if he was getting a migraine. The defendant replied: "Because you never know how hard a migraine is going to hit you."

¶ 22      When the defendant stopped his truck, the front right tire came off the road at the end of a culvert. The truck was stuck at that point. The defendant attempted to call a friend for help, but he did not attempt to call the police. The defendant said that he did not have much faith in the police. The defendant testified that he was only able to use "redial" on his cell phone; he was not able to read the numbers on his cell phone screen. The defendant exited the vehicle and unlocked the bed of his truck with his keys. The defendant searched the bed of the truck for medication to

7

try to relieve his migraine pain. He testified that he usually kept over the counter medications in the bed of his truck. He had not been prescribed any migraine medication at that time. He did not find any medication, but he found a jar of moonshine that he had taken from his brother. The defendant took a few drinks in an attempt to alleviate his migraine pain and try to lower his blood pressure. The defendant then put the jar in the cab of his truck and began walking to a nearby farm. Cherry stopped him before he reached the farm.

¶ 23     Cherry accused the defendant of being intoxicated. The defendant told Cherry he had taken approximately three drinks of moonshine 5 to 10 minutes earlier. The defendant did not tell Cherry about his migraine. The defendant said he tried to explain the situation to Cherry, but Cherry became upset and told the defendant that the judge would figure it out.

¶ 24     Cherry placed the defendant in his squad car and drove him back to where his truck was located. Cherry and the defendant both exited the squad car. Cherry began questioning the defendant. Cherry told the defendant that he would be doing a field sobriety test and began explaining the test. The defendant told Cherry three times that he had to "go to the bathroom like right now." The defendant walked away from Cherry and urinated in the fender well of his truck. When he returned to where Cherry was standing, there was "a little wet spot" that was no larger than a silver dollar on the front of his jeans. On cross-examination, the prosecutor asked the defendant if he urinated on himself before he walked over to his truck. The defendant replied: "Whenever he started demonstrating the field sobriety test, that's when I said I've got to go now. I looked down and there was already a wet spot starting down there." The defendant testified that he had left his house approximately one hour earlier.

¶ 25     When the defendant returned, Cherry would not let the defendant attempt to complete the field sobriety test. Cherry told the defendant that he had failed the test. Cherry then arrested the

8

defendant, put him in handcuffs, and placed him in the squad car. The defendant did not beat his head on the windows of the squad car. Cherry began searching the defendant's truck, and he found a partially empty jar of moonshine. Cherry transported the defendant to the county jail. The defendant was asked to submit a breathalyzer sample, and the defendant said he wanted to consult with a lawyer before he submitted a sample. The defendant then had to sign a paper saying that he was refusing the test in order to be released from jail.

¶ 26    The defendant never explained to Cherry why he had been drinking. The defendant did not tell Cherry that he was drinking off a woman; the defendant testified that Cherry "randomly came up with that." The defendant did not have a girlfriend at the time of the incident, and he had last had a girlfriend approximately seven years before the incident. The defendant testified that his left knee was worn out, which caused a "good hitch in [his] step." The defendant also had problems with his lower back. The defendant opined that he was not impaired mentally or physically on the date of the incident due to his consumption of the three shots of moonshine.

¶ 27    Dr. Paul Rudy testified that he treated the defendant in June 2015. The defendant reported that he had a sore knee, migraine headaches, and a history of high blood pressure. Rudy ordered an X-ray of the defendant's knee and referred him to an orthopedic surgeon. The orthopedic surgeon believed that the defendant had osteoarthritis of the left knee. Rudy estimated that it would take 15 to 20 years for osteoarthritis to develop and become problematic. Rudy testified that the defendant took medication for his migraine headaches, his blood pressure, and to help him sleep. Rudy could not recall if he was treating the defendant at the time of the incident.

¶ 28    Richard Stinson testified as a rebuttal witness for the State. Stinson testified that he had lived in an A-frame house on the gravel lane where the incident occurred. He had lived there for 32 years. Stinson was not home at the time of the incident. He knew Smith, who was his

9

neighbor. Smith had never been to Stinson's residence, and she would not have permission to be in his residence if he was not home. Smith did not have keys to Stinson's residence.

¶ 29    The jury found the defendant guilty, and the court sentenced him to four years' imprisonment.

¶ 30                                    II. ANALYSIS

¶ 31    The defendant argues that the court erred during jury selection when it failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Rule 431(b) provides:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a the defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a the defendant does not testify it cannot be held against him or her ***." *Id.*

The defendant argues that the court failed to comply with Rule 431(b) in that it failed to advise any of the jurors of the third principle—namely, that the defendant was not required to offer any evidence on his own behalf. The defendant also argues that the court failed to advise one of the panels of prospective jurors that the decision not to testify could not be held against the defendant, and it failed to ask many of the prospective jurors who were ultimately selected whether they understood and accepted the principles.

¶ 32    The defendant acknowledges that he failed to properly preserve this issue for review, but he requests that we review the issue for plain error. In conducting plain error review, we first determine whether a clear or obvious (*i.e.*, plain) error occurred. *People v. Hollahan*, 2019 IL

10

App (3d) 150556, ¶ 19; *People v. Piatkowski*, 225 Ill. 2d 551, 565 n.2 (2007). If a clear or obvious error has occurred, then we proceed to determine whether the error was reversible. *Hollahan*, 2019 IL App (3d) 150556, ¶ 19. "Plain errors are reversible only when (1) 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) the error is 'so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *Piatkowski*, 225 Ill. 2d at 565). Here, the defendant argues only that the first prong applies—*i.e.*, that the evidence was so closely balanced that the error alone threatened to tip the scales of justice. The State admits that the trial court committed the errors identified by the defendant but argues that the trial evidence was not closely balanced as to whether the defendant was under the influence of alcohol while driving a vehicle.

¶ 33        In determining whether the trial evidence was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Our supreme court has found the evidence to be closely balanced for purposes of plain error review when the outcome turns on how the finder of fact resolves a contest of credibility. *Id.* ¶ 63; *People v. Naylor*, 229 Ill. 2d 584, 608-09 (2008). "A 'contest of credibility' exists when (1) both sides presented a plausible version of events and (2) there is no extrinsic evidence to corroborate or contradict either version." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 74.

¶ 34        In *Sebby*, our supreme court found that the trial evidence amounted to a contest of credibility such that it was closely balanced where the defense witnesses and State witnesses gave conflicting but equally plausible versions of events and there was no extrinsic evidence.

11

*Sebby*, 2017 IL 119445, ¶¶ 62, 63. Similarly, in *Naylor*, the court held that the evidence was closely balanced where the defendant and the two police officers who testified for the State gave different versions of events, which were both credible. *Naylor*, 229 Ill. 2d at 608-09. In reaching its holding, the *Naylor* court noted that the defendant's testimony was consistent with much of the two officers' testimony. *Id.* at 607.

¶ 35    Here, a qualitative, commonsense evaluation of the totality of the evidence shows that the evidence was not closely balanced. Smith's and Cherry's testimony showed that the defendant was under the influence of alcohol while he operated his truck. Smith testified that she saw the defendant drive up to her earth shelter house on the date of the incident. Smith stated that the defendant struggled to exit his truck, did not walk in a straight line, and his speech was slow and slurred. Smith testified that the defendant did not leave right away when she told him to leave and that she would call the police.

¶ 36    Cherry testified that he arrived at the scene approximately three minutes after receiving a dispatch. He observed the defendant's truck stuck in a ditch and the defendant walking down the middle of a highway. The defendant was wobbling, his head was bobbing, and his speech was slurred. Cherry also observed that the defendant had urinated on himself. The defendant admitted to Cherry that he had been drinking alcohol. Cherry attempted to have the defendant perform the one legged stand test, but the defendant could not raise his leg without falling. Cherry found a jar of apple pie moonshine in the defendant's truck that was two-thirds empty.

¶ 37    Although the defendant testified that he did not begin drinking alcohol until after his truck became stuck in the ditch, the defendant's version of events was implausible. The defendant claimed that while he was driving to a friend's house, he decided to stop and take photographs of an A-frame house that he had helped construct 30 years earlier despite the fact

12

that he was developing a migraine headache. He testified that he encountered Smith outside the A-frame house, and she told him to leave. This was contradicted by Smith's testimony that she encountered the defendant at her own residence. Smith's and Stinson's testimony established that Stinson, not Smith, lived in the A-frame house on the gravel lane. Stinson testified that Smith had never been to his house before. It is implausible that Smith would have gone to Stinson's house for the first time on the date of the incident and ordered the defendant to leave the house.

¶ 38　　　　The defendant testified that his truck got stuck in a ditch when he pulled over because his vision was becoming blurred. The defendant said that he then had a few drinks of moonshine, which he happened to have in the bed of his truck, in an attempt to alleviate the pain from his migraine headache. However, the defendant did not tell Cherry about his migraine headache. Also, the defendant testified that he began urinating in his pants while Cherry explained a field sobriety test. This would be unusual behavior if the defendant had not been mentally or physically impaired by alcohol, as he claimed.

¶ 39　　　　Thus, the defendant's version of events was highly improbable. See *People v. Adams*, 2012 IL 111168, ¶ 22 (holding that the evidence was not closely balanced where the defendant's testimony regarding the incident was highly improbable). Also, unlike in *Naylor*, 229 Ill. 2d at 607, the defendant's version of events was largely inconsistent with that of the State's witnesses. Because the defendant's version of events was implausible, this case does not present a contest of credibility, as in *Sebby* or *Naylor*. Thus, we find that the trial evidence was not closely balanced.

¶ 40　　　　In arguing that the evidence was closely balanced, the defendant relies heavily on the fact that the jury at his second trial was unable to reach a verdict, resulting in a mistrial. We acknowledge that our supreme court has found the fact that a prior mistrial occurred to be

13

relevant when evaluating the strength of the trial evidence. See *People v. Stechly*, 225 Ill. 2d 246, 310-11 (2007) ("[T]he fact that a jury of the defendant's peers was unable to reach a verdict as to his guilt tends to show that the evidence against him was not utterly overwhelming."). While the jury's inability to agree on a verdict at the second trial is a relevant consideration, it is not dispositive. The evidence in this case was not closely balanced, despite the prior hung jury, for the reasons previously discussed.

¶ 41                                   III. CONCLUSION

¶ 42          The judgment of the circuit court of Henry County is affirmed.

¶ 43          Affirmed.